Sylvia GRAY, Appellant,

v.

CHCA BAYSHORE L.P. d/b/a
Bayshore Medical Center and
Ira H. Rapp, M.D., Appellees.

No. 01–04–00918–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 26, 2006.

Michael D. Farmer, Plummer & Farmer, Houston, TX, for Appellant.

Larry D. Thompson and Robert G. Smith, Lorance & Thompson, P.C., Griffin Vincent and Solace Kirkland Southwick, Andrews Kurth LLP, Houston, TX, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

This appeal arises from a medical malpractice claim brought by appellant, Sylvia Gray, against appellees, CHCA Bayshore L.P. d/b/a Bayshore Medical Center (Bayshore) and Ira H. Rapp, M.D. The trial court dismissed Gray's suit with prejudice after concluding that the expert report she filed failed to satisfy the requirements set forth in section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2005). In her sole issue on appeal, Gray argues that the trial court erred in finding that her expert report did not comply with the statute.

We affirm.

## BACKGROUND

In 2001, Gray was admitted to Bayshore for surgical treatment of chronic sinusitis and nasal septal deformity. For the surgery, Gray was administered a general anesthetic by Dr. Rapp. Upon regaining consciousness after the operation, Gray became aware of severe pain in her left knee. Subsequent examination by an orthopedist and a neurologist revealed a dislocation of the knee's patella. Gray, age 39, had no prior history of knee injuries.

In November 2003, Gray brought suit against Bayshore, Dr. Rapp, and Phillip A. Matorin, M.D., seeking to recover damages resulting from the injury to her knee.[1] Gray's suit alleged that the injury was caused by the flexing of her left leg during surgery and that the injury could have

---

1. Dr. Matorin was the admitting physician. He was non-suited in July 2004.

been prevented had Dr. Rapp and the Bayshore's nursing staff properly monitored Gray's extremities during the operation. In March 2004, Gray filed the report of her medical expert, Dr. Richard F. Toussaint, M.D., as required by section 74.351 of the Texas Civil Practice and Remedies Code. *See id.* Both Bayshore and Dr. Rapp moved to dismiss Gray's suit, arguing that Dr. Toussaint's expert report failed to comply with the requirements of section 74.351. *See id.* The trial court then granted Gray a 30–day extension to cure any deficiencies in her expert report. *See id.* § 74.351(c).

Gray filed her amended expert report in June 2004. The report, again by Dr. Toussaint, reads in pertinent part:

Ms. Gray was administered a general anesthetic for the sinus surgery by Ira H. Rapp, M.D. During the surgery, Ms. Gray's knees and arms had become flexed, and when she awoke from the anesthetic, she noted severe pain upon attempting to move from a bedpan. She was noted to have a negative history of knee injury. Ms. Gray was seen by John H. Ownby, M.D., neurologist, and Ronald B. Heisey, M.D., orthopedist, who upon subsequent workup of Ms. Gray's knee pain determined that her left patella had become dislocated.

Based on the forgoing and my education, training, experience, and reasonable medical probability, it is my opinion that Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the nursing staff of Bayshore Medical Center breached the standard of care for failing to properly monitor, treat, and prevent the resultant left knee injury and dislocation of the left patella.

Based on the Texas definitions, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff were negligent by failing to properly monitor, treat, and prevent Ms. Gray's left patella dislocation. The negligence was in the following:

1. Dr. Ira H. Rapp, M.D. failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while under a general anesthetic. The standard of care in this circumstance would be for a physician to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

2. The Bayshore Medical Center perioperative nursing staff failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while in the operating room. The standard of care in this circumstance would be for the perioperative nursing staff to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

In the above instance, had Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff monitored and detected the flexing of Ms. Gray's arms and legs during general anesthesia in a timely fashion, then in reasonable medical probability, the pain and suffering experienced by Ms. Gray from the dislocated left patella would not have occurred along with the resultant necessary treatments. The failure to monitor, detect, diagnose, and timely treat a malpositioned left knee during a general anesthetic was negligence and proximately caused the dislocated left patella and subsequent pain and suffering experienced by Ms. Gray on December 5, 2001.

This opinion is based on the available medical records that you have provided for my review. I understand that negligence is the failure to use ordinary care,

failure to do what a physician, or operating room nurse, of ordinary prudence would have done under the same or similar circumstances. I also understand that proximate cause is a cause which in a natural and continuous sequence produces an event, and without which, such an event would not have occurred. I also understand that in order to be a proximate cause, an act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

Based on these definitions, and on a reasonable degree of medical probability, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff failed to meet the standard of care when they neglected to monitor and detect a malpositioned left knee resulting in a dislocated left patella on December 5, 2001. The failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment.

After receiving Gray's amended expert report, Bayshore and Dr. Rapp again moved to dismiss the suit, arguing that the report still did not comply with section 74.351. After a hearing, appellees' supplemental motions to dismiss were granted, and Gray timely appealed.

## DISCUSSION

In her sole issue on appeal, Gray contends that the trial court erred in its determination that Dr. Toussaint's report did not comply with section 74.351 of the Civil Practice and Remedies Code. Specifically, she argues that Dr. Toussaint's report constituted an objective good faith effort to comply with the requirements of section 74.351, and thus contends that the trial court acted improperly in dismissing her

suit. *See id.* § 74.351(*l*) (stating that a court shall grant a challenge to an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort" at compliance).

### Standard of Review

We review all section 74.351 rulings under an abuse of discretion standard. *Am. Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

### Section 74.351 of the Texas Civil Practice and Remedies Code

Pursuant to section 74.351, medical malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351. If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *See id.* at § 74.351(a). The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l*). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the

expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878–79.

■ Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878–79. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id.* at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and must instead rely exclusively on the information contained within the report's four corners. *See Palacios,* 46 S.W.3d at 879.

### Dr. Toussaint's Report

Dr. Toussaint's amended report essentially states that, as to both Bayshore and Dr. Rapp: (1) the applicable standard of care required monitoring the positioning of Gray's extremities; (2) appellees failed to monitor the positioning of Gray's left knee; and (3) had appellees monitored the knee's position, Gray, within reasonable medical probability, would not have suffered a dislocated patella. Although the report, at first glance, thus appears to articulate the three statutorily required elements of an expert report, we are compelled, under an abuse of discretion standard, to conclude that the trial court did not act unreasonably in granting appellees' motions to dismiss.

■ The supreme court held in *Palacios* that medical malpractice plaintiffs must provide an expert report detailing standard of care, breach, and causation as to each defendant. *Id.* Here, the report states, without explanation, that a single standard of care applied to both Bayshore and Dr. Rapp. While it is possible that an identical standard of care regarding limb monitoring during and after surgery attaches to an anesthesiologist (Dr. Rapp) and a perioperative nursing staff (Bayshore), such generic statements, without more, can reasonably be deemed conclusory. Conclusory statements regarding standard of care, breach, or causation, do not constitute a good faith effort to comply with section 74.351 in that they fail to adequately inform each defendant of the specific conduct called into question by the plaintiff's claims. *See id.*

■ Similar weaknesses undermine Dr. Toussaint's report in regard to how appellees breached the applicable standard of care. Whether a defendant breached the standard of care due a patient cannot be determined without "specific information about what the defendant should have done differently." *See id.* at 880. Here, Dr. Toussaint's report contains only a general statement that appellees failed to monitor Gray's left knee properly. The report provides no specific information concerning what actions appellees should have taken in the event they observed Gray's knee flexing. Indeed, a literal reading of the report's most direct statements concerning breach leads to the conclusion that simply monitoring Gray's ex-

tremities, and taking no corrective action, would have prevented her injury. In view of such general and conclusory statements concerning breach, we cannot conclude that the trial court abused its discretion in dismissing Gray's suit.[2] *See id.* at 879.

Conclusory statements also plague the report's efforts to satisfy the statutory element of causation. Specifically, Dr. Toussaint's report does not state with any specificity how appellees departure from the stated standard of care caused Gray's knee injury. Instead, the report provides only the conclusory statement that the failure to monitor caused Gray's injury. By not fleshing out how appellees' failure to monitor Gray's extremities caused her injury, the report does not convincingly tie the alleged departure from the standard of care to specific facts of the case. Such a failure has been found to be a sufficient reason for concluding that an expert report is statutorily inadequate. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53.

We further note that the report appears to be inconsistent with respect to the relationship among the standard of care, breach, and the cause of Gray's injury. Specific language in the report indicates that the applicable standard of care breached by the defendants was "monitor[ing] the positioning of the patient's extremities." The report then appears to depart from this limited standard of care and breach, stating, "The failure to *monitor, detect, diagnose, and timely treat* a malpositioned left knee during general anesthetic was negligence, and proximately caused the dislocated left patella." (Emphasis added.) The report thus fails to put the appellees on notice as to who had what responsibility and how that person or persons departed from the standard of ordinary medical care of a patient under anesthesia in failing to do some specific act required by a person in that position, causing damage that would not have happened had ordinary professional care been used. Considering that the trial court is limited to the four corners of the report in making its determination, one could reasonably conclude that the conclusory language in the report, together with the inconsistency as to appellant's complaint, convinced the trial court that the report failed to satisfactorily inform each appellee of the specific conduct being challenged. *Palacios,* 46 S.W.3d at 878–79.

In view of the conclusory, and at times inconsistent, statements within Dr. Toussaint's expert report, we cannot conclude that the trial court abused its discretion in granting appellees' motion for dismissal. We thus overrule Gray's sole issue on appeal.

## CONCLUSION

We affirm the trial court's order of dismissal.

**2.** We note that in *Strom v. Mem'l Hermann Hospt. Sys.,* this court upheld a trial court's decision to dismiss a remarkably similar suit due to the filing of an inadequate expert report. 110 S.W.3d 216 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In *Strom,* the plaintiff similarly alleged that she sustained an injury to her left knee due to improper positioning of her extremities during surgery. *Id.* at 219. The expert report Strom provided contained considerably more detail than Dr. Toussaint's report, referring specifically to the need to properly pad, strap, and place a patient's extremities during surgery. *Id.* at 224.