In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-07-088 CV


____________________



BENJAMIN T. AGANA, JR., Appellant



V.



BILLIE L. TERRELL ON BEHALF OF CAROLYN TERRELL, Appellee






On Appeal from the 221st District Court


Montgomery County, Texas


Trial Cause No. 06-09-08598-CV






MEMORANDUM OPINION


 Appellee Billie L. Terrell sued appellant Benjamin T. Agana, Jr., M.D. and other
defendants for alleged medical malpractice. (1) Agana filed a motion to dismiss that challenged
the adequacy of Terrell's expert report. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l)
(Vernon Supp. 2006). The trial court denied Agana's motion to dismiss. Agana then filed
this interlocutory appeal. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon
Supp. 2006). We affirm.

Background


 Terrell's petition alleged that as a result of the negligence of Agana (the patient's
attending physician) and other defendants, Carolyn developed "severe and painful . . . ulcers
. . . around her peri-anal area." Terrell alleged that Agana was negligent in failing to properly
monitor Ms. Terrell's peri-anal tissue and failing to provide appropriate treatment and
monitoring, as well as failing to properly supervise the nursing staff, failing "to demand
compliance with Agency for Health Care Policy and Research (AHCPR) pursuant to Title
IX of the Public Health Service Act to assure proper medical attention to Mrs. Terrell[,]" and
failing to assure that proper wound cleansing was done and that all urine and feces were
promptly cleaned to assure the prevention of the peri-anal wound and to prevent infection. Terrell filed a report by Dr. Aimee D. Garcia, a physician who is board certified in
internal medicine and geriatrics and is a certified wound care specialist. According to
Garcia's report, upon Carolyn's admission to HealthSouth Rehabilitation Hospital
("Healthsouth"), her diagnoses included hypertension, diabetes mellitus, and small cell lung
cancer that had metastasized to her brain. Garcia's report indicated that when Carolyn was
admitted to HealthSouth, her "skin was noted to be intact, and pain assessments done
revealed no complaints of pain from the patient." The report also noted that Agana was
Carolyn's attending physician. Dr. Garcia's report noted that on April 2, 2006, three days
after Carolyn's admission, her buttocks were reddened and excoriated, but "[n]o plan for
intervention is documented, and there is no documentation that the patient's physician or
family was notified of the change in skin condition." In her report, Garcia noted that on
April 6, a low air loss mattress was ordered, a turning schedule was established for Carolyn, 
and a topical ointment called Xenaderm was ordered for Carolyn's skin.

 Garcia's report stated that on April 8, a wound care nurse ordered Nystatin to be
applied to Carolyn's perirectal area along with the Xenaderm. According to Garcia, after
Agana assessed the patient on April 11, he ordered reinsertion of a foley catheter to control
Carolyn's urinary incontinence and prescribed medication to control her fecal incontinence. 
According to Garcia, the nurses noted that Carolyn's "'buttocks and rectum are very sore and
red with open areas, very difficult to clean and she cries when you touch the area.'" Garcia
stated that despite the pain in Carolyn's perianal area, the nursing staff continued turning
Carolyn onto her back. Garcia pointed out that on April 17, Carolyn's buttocks were noted
to be "'extremely excoriated due to yeast. Open, bleeding.'" Garcia's report also explained
that after Carolyn's discharge to her home with home health care services, the sores
improved, and she remained at home until May 1, 2006, when she died at a nursing facility.

 Garcia's report applied the same standard of care to both Agana and another
physician, Dr. Alexander, who was an "Internal Medicine consult physician who was asked
to manage the patient's overall medical conditions." According to Garcia, the standard of
care required both doctors to monitor Carolyn's skin as part of her daily care. Garcia opined
that both Agana and Alexander were negligent in failing "to order appropriate laboratory
analysis to address nutritional state" and failing "to perform skin examinations and monitor
[the] patient's skin[.]" According to Garcia, Agana and Alexander should have assessed
Carolyn's skin during their daily rounds. Garcia stated in her report that although Agana and
Alexander made daily progress notes, neither physician assessed Carolyn's skin. Garcia
opined that "[h]ad her attending physicians been monitoring her skin, they could have written
orders to intervene sooner and prevented further breakdown of the patient's skin." Garcia
also noted that neither Agana nor Alexander assessed Carolyn's skin prior to discharge, and
she opined, "This lack of monitoring constitutes negligence, and is a breach in the standard
of care. The lack of monitoring was a direct and proximate cause of the deterioration in the
patient's skin, and led to significant pain and suffering."

 With respect to nutritional assessment of Carolyn, Garcia's report stated as follows:

 Dr. Agana documents in the progress note on 4/1/06 that the patient's albumin
is 3.1, indicating depleted protein stores. It appears that blood was drawn on
4/4/06 to assess albumin, but the labs are never received, and never followed
up on. Given the patient's medical conditions, including diabetes mellitus and
small cell lung cancer, her nutritional state was very important. An evaluation
of the patient's nutritional state with albumin and prealbumin should have been
done, and appropriate interventions put in place if the patient's intake indicated
poor nutrition. Also, when the patient experienced breakdown of her skin, re-assessment should have been done, as additional nutrition is required to heal
skin breakdown. Neither Dr. Agana nor Dr. Alexander monitored the patient's
nutritional status, which is a breach in the standard of care, and more likely
than not contributed to her overall poor healing.

Garcia also noted that given Carolyn's medical history, her attending physicians should have
been monitoring her input and output, which would have required the use of a foley catheter. 
Garcia stated that on April 17, 2006, the nursing staff disconnected the foley catheter, yet the
attending physicians did not indicate this on their progress notes, and they did not order
reinsertion of the foley catheter until April 11, 2006. Garcia further noted that Carolyn's
sodium levels were assessed only once during her stay at HealthSouth, and because the
purpose of Carolyn's stay at HealthSouth was "to receive aggressive rehabilitation in an
effort to make her stronger[,]" her "[o]verall care should have included aggressive attention
to her underlying medical conditions, including her hyponatremia and diabetes mellitus, both
of which could significantly impact her ability to rehabilitate." Garcia's report stated that
Carolyn's diarrhea and copious urine output placed her at risk for dehydration, and that the
"lack of monitoring of the patient was below the standard of care." Garcia concluded "[i]n
summary" that the care provided by Agana and other defendants fell below the standard of
care, and "[t]he lack of monitoring by the physicians was a breach in the standard of care and
contributed to [Carolyn's] overall decline."

Agana's Issue


 In his sole issue, Agana contends the trial court abused its discretion by denying his
motion to dismiss. We review a trial court's decision regarding the adequacy of an expert
report under an abuse of discretion standard. Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 877-78 (Tex. 2001). "A trial court abuses its discretion if it acts
in an arbitrary or unreasonable manner without reference to any guiding rules or principles." 
Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A trial court also abuses its
discretion if it fails to analyze or apply the law correctly. Walker v. Packer, 827 S.W.2d 833,
840 (Tex. 1992).

 A plaintiff asserting a healthcare liability claim must provide each defendant physician
and healthcare provider with an expert report no later than the 120th day after filing suit. 
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2006). The statute defines
"expert report" as 

 a written report by an expert that provides a fair summary of the expert's
opinions as of the date of the report regarding applicable standards of care, the
manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.


Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon Supp. 2006). If a plaintiff
furnishes the required report within the time permitted, the defendant may file a motion
challenging the report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l).

 The statute provides that the trial court "shall grant a motion challenging the adequacy 
of an expert report only if it appears to the court, after hearing, that the report does not
represent an objective good faith effort to comply with the definition of an expert report in
Subsection (r)(6)." Id. When determining whether the report represents a good-faith effort,
the trial court's inquiry is limited to the four corners of the report. Wright, 79 S.W.3d at 53;
Palacios, 46 S.W.3d at 878. To constitute a good-faith effort, the report "must discuss the
standard of care, breach, and causation with sufficient specificity to inform the defendant of
the conduct the plaintiff has called into question and to provide a basis for the trial court to
conclude that the claims have merit." Palacios, 46 S.W.3d at 875. When a plaintiff sues
more than one defendant, the expert report must set forth the standard of care applicable to
each defendant and explain the causal relationship between each defendant's individual acts
and the injury. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6) (A claimant must
provide each defendant with an expert report that sets forth the manner in which the care
rendered failed to meet the standards of care and the causal relationship between that failure
and the injuries claimed.); Doades v. Syed, 94 S.W.3d 664, 671-72 (Tex. App.--San Antonio
2002, no pet.); Rittmer v. Garza, 65 S.W.3d 718, 722-23 (Tex. App.--Houston [14th Dist.]
2001, no pet.). An expert may not assert that multiple defendants are all negligent for failing
to meet the standard of care without providing an explanation of how each defendant
breached the standard of care and how that breach caused or contributed to the injury. Taylor
v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241, 244 (Tex. App.--Corpus Christi 2004,
no pet.). Although an expert report need not marshal and present all of the plaintiff's proof,
a report that omits any of the elements required by the statute does not constitute a good-faith
effort. Palacios, 46 S.W.3d at 878-79.

 Agana argues Garcia's report is inadequate because it did not set forth separate
standards of care for him and for Dr. Alexander. Agana also complains that Garcia's report's
statements regarding the causal link between the allegedly negligent care and the alleged
injuries are conclusory, and he asserts the report "does not contain a sufficient description
of what Dr. Agana did or did not do." We first address Agana's contention that the report
is inadequate because it did not set forth separate standards of care for him and Dr.
Alexander. In support of his argument, Agana cites Gray v. CHCA Bayshore L.P., 189
S.W.3d 855 (Tex. App.--Houston [1st Dist.] 2006, no pet.), Longino v. Crosswhite, 183
S.W.3d 913 (Tex. App.--Texarkana 2006, no pet.), and Cavazos v. Cintron, No. 13-04-00529-CV, 2006 WL 1766189 (Tex. App.--Corpus Christi, June 29, 2006, no pet.) (mem.
op.).

 In Gray, the plaintiff sued appellees, CHCA Bayshore L.P. and two physicians, after
she sustained a knee injury during surgery for her chronic sinusitis and nasal septal
deformity. Gray, 189 S.W.3d at 856. The plaintiff's expert report stated that the two
physicians and appellee "failed to meet the standard of care when they neglected to monitor
and detect a malpositioned left knee resulting in a dislocated left patella. . . . The failure to
monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe
pain and suffering, and subsequent medical treatment." Id. at 858. The report applied the
same standard of care to the physicians and to the hospital. Id. at 859. In finding the report
insufficient, the Gray court noted, "[w]hile it is possible that an identical standard of 
care . . . attaches to an anesthesiologist . . . and a perioperative nursing staff . . ., such generic
statements, without more, can reasonably be deemed conclusory." Id. In this case, Garcia's
report specifically explained that the same standard of care applied to both physicians, i.e.,
both physicians were responsible for Carolyn's daily care, which included the duty to monitor
the condition of her skin. Therefore, Gray is distinguishable.

 In Longino, the plaintiffs took their child to the emergency room, where the child was
treated by Dr. Ricky Cameron. Longino, 183 S.W.3d at 915. After the child's condition
deteriorated, the plaintiffs returned the child to the emergency room. Id. Dr. Cameron then
consulted with appellant Dr. James Longino, a pediatrician who had previously treated the
child, and Longino ordered tests that showed the child had bacterial meningitis. Id. Longino
argued that the plaintiffs' expert report failed to provide specific information concerning his
conduct because it applied the same standard of care to both physicians. Id. at 915, 917. 
Plaintiffs' expert report stated,

 Dr. Cameron['s] and Dr. Longino's care of [the child] fell below the
standard of care for the emergency diagnosis and treatment of bacterial
meningitis in a child. Their failure to either recognize or acknowledge the
obvious symptoms of fever, altered mental status, and neck pain; to perform
a timely diagnostic lumbar puncture; and to aggressively treat [the child's]
bacterial meningitis with an appropriate combination of antibiotics led to an
unnecessary exacerbation of his symptoms. Subsequently, this prolonged
symptomatology was a cause of [the child's] significant and permanent
neurological injuries.


Id. at 917. In finding the expert report insufficient, the Longino court stated, "the expert
report fails to differentiate between the conduct of Cameron and Longino, and the
complained-of conduct occurred while Cameron was the treating physician. The report
contains no specific information concerning how Longino breached the standard of care apart
from Cameron's conduct." Id. Unlike the appellant in Longino, Agana was Carolyn's
attending physician, and, as such, he was responsible for her overall care. Furthermore,
unlike the physicians in Longino, both physicians in this case were responsible for Carolyn's
overall care. Therefore, Longino is distinguishable.

 In Cavazos, the expert report stated that he reviewed the medical records from
appellee and two other defendants and opined that the breach of the standard of care caused
the injury. Cavazos, 2007 WL 1766189 at *2. The report did not expressly state that the
same standard of care applied to each defendant or explain why it would be appropriate to
apply the same standard of care to each defendant. See id. In the case sub judice, the expert
report explicitly discussed why the same standard of care applied to both Agana and
Alexander.

 Furthermore, in Taylor v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241 (Tex.
App.--Corpus Christi 2004, no pet.), which the Cavazos court cited, the plaintiff's expert
report failed to set forth separate standards of care for the physician and those of other
physicians and healthcare entities. Taylor, 169 S.W.3d at 242, 244-45. The Taylor court
noted that the report set forth the same standard of care for all of the defendants, without
presenting "the standards of care relevant to each of the three different parties[]" or
explaining what each party should have done and what each party failed to do. Id. at 245. 
In the case sub judice, unlike Taylor, the expert report explicitly stated that both the attending
physician (Agana) and the consulting physician (Alexander) were responsible for Carolyn's
overall daily care, which included monitoring the condition of her skin. Taylor requires that
the expert report state a standard of care for each healthcare provider; however, nothing in
Taylor explicitly forbids applying the same standard of care to more than one physician if the
physicians owe the same duty to the patient. See id. at 245-46.

 Appellant cites no authorities that explicitly forbid an expert from applying the same
standard of care to two physicians, when each is responsible for an overlapping aspect of a
patient's care, and we are aware of none. Furthermore, the cases Agana cites in support of
his contention that the report is inadequate because it failed to set forth different standards
of care for him and Dr. Alexander are distinguishable.

 We now turn to Agana's contentions that the report's statements regarding causation
are conclusory and that the report does not sufficiently explain what Agana did or failed to
do. We address these arguments together. Agana complains that although Garcia's report
states that he should have been monitoring Carolyn's skin, the report does not explain what
type of monitoring should have been done or "precisely how it was done improperly."
According to Garcia's report, Agana was negligent in failing to examine Carolyn's skin and
failing "to order appropriate laboratory analysis to address [Carolyn's] nutritional state."
Garcia stated that if Agana had properly monitored Carolyn's skin, he could have prevented
the breakdown of her skin. In addition, Garcia stated that Agana failed to assess Carolyn's
skin before discharging her, and that "[t]his lack of monitoring constitutes negligence, and
is a breach in the standard of care. The lack of monitoring was a direct and proximate cause
of the deterioration in the patient's skin, and led to significant pain and suffering."

 Garcia also noted that although laboratory testing of Carolyn's albumin revealed
depleted protein stores, Agana never followed up on those results, and that this breach of the
standard of care "more likely than not contributed to her overall poor healing." Garcia
opined that Agana's failure to meet the standard of care directly and proximately caused
Carolyn's bedsores. Garcia's statements regarding causation are not conclusory; rather,
Garcia clearly explains that if Carolyn's skin had been properly monitored, she would not
have developed bedsores, and the bedsores would not have been exacerbated. By their
nature, bedsores are observable by visual examination. We find that Garcia's report
sufficiently sets forth the type of monitoring that Agana should have done. Garcia's report
discusses the standard of care, breach, and causation with sufficient specificity to inform
Agana of the conduct Terrell has called into question and to provide a basis for the trial court
to conclude that the claims have merit. See Palacios, 46 S.W.3d at 875. Therefore, the trial
court did not abuse its discretion in denying Agana's motion to dismiss. We overrule
Agana's sole issue and affirm the trial court's judgment.

 AFFIRMED.


 ______________________________

 STEVE McKEITHEN

 Chief Justice




Submitted on May 10, 2007

Opinion Delivered June 21, 2007


Before McKeithen, C.J., Kreger and Horton, JJ.
1. Terrell sued on behalf of the patient, Carolyn Terrell.