In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-07-198 CV


 _____________________




SUNITHA C. ALEXANDER, Appellant



V.



BILLIE L. TERRELL ON BEHALF OF CAROLYN TERRELL, Appellees






On Appeal from the 221st District Court


Montgomery County, Texas


Trial Cause No. 06-09-08598 CV






MEMORANDUM OPINION
 

 This appeal involves the adequacy of an expert report in a healthcare liability claim. 
Billie L. Terrell, individually and on behalf of his deceased wife, Carolyn Terrell, sued Dr.
Sunitha C. Alexander and others (1)
 for alleged medical malpractice. In her motion to dismiss
the suit, Alexander challenged the adequacy of Terrell's expert report. See Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(l) (Vernon Supp. 2006). The trial court denied Alexander's
dismissal motion, and Alexander filed this interlocutory appeal. Tex. Civ. Prac. & Rem.
Code Ann. § 51.014(a)(9) (Vernon Supp. 2006). We affirm in part and reverse in part. 

 A plaintiff asserting a healthcare liability claim must submit an expert report to each
healthcare provider and defendant physician. Tex. Civ. Prac. & Rem. Code Ann. §
74.351(a) (Vernon Supp. 2006). The expert report must provide a fair summary of the
expert's opinions, as of the date of the report, on the applicable standards of care, the manner
in which the care rendered by the physician or healthcare provider failed to meet the
standards, and the causal relationship between that failure and the injury, harm, or damages
claimed. Id., § 74.351(r)(6) (Vernon Supp. 2006). The report must discuss the three
elements with sufficient specificity in order to inform the defendant of the conduct the
plaintiff has questioned and to provide a basis for the trial court to conclude the claims are
meritorious. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.
2001). The report need not marshal all of the plaintiff's proof, but must include the expert's
opinion on each of the statutory elements. Id. at 878. If a plaintiff sues more than one
defendant, the expert report must set forth the standard of care applicable to each defendant
and explain the causal relationship between each defendant's individual acts and the injury. 
See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(4),(6); Agana v. Terrell, No. 09-07-088 CV, 2007 WL 1793786, at *3 (Tex. App.--Beaumont June 21, 2007, no pet. h.); Taylor
v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241, 244 (Tex. App.--Corpus Christi 2004,
no pet.). The trial court shall grant a motion challenging an expert report's adequacy "only
if it appears to the court, after hearing, that the report does not represent an objective good
faith effort to comply with the definition of an expert report in Subsection (r)(6)." §
74.351(l). The trial court limits its adequacy inquiry to the four corners of the report. Bowie
Mem'l Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002). 

 We review a trial court's decision regarding the adequacy of an expert report under
an abuse of discretion standard. Palacios, 46 S.W.3d at 878. The trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding
rules or principles. Bowie Mem'l Hosp., 79 S.W.3d at 52. 

 Plaintiff pled that the negligence of Dr. Alexander and the other defendants caused
Carolyn Terrell's "multiple decubiti and ulcers" which were "significant contributing
conditions to [her] death[.]" The plaintiff submitted an expert report through Dr. Aimee D.
Garcia, a board-certified physician in geriatrics and internal medicine and a certified wound
care specialist. The report makes no attempt to establish a causal relationship between the
failure to monitor Carolyn's skin condition and nutritional status and her death. Dr.
Alexander's motion to dismiss asserts the report contains no factual information linking her
action or inaction to Carolyn's death. To the extent that plaintiff sues on a wrongful death
claim and asserts that Alexander's negligence contributed to Carolyn's "overall decline" and
death, the expert report is not adequate, and any wrongful death claim must be dismissed. In our companion opinion in this suit, this Court set out facts that Dr. Garcia stated
in her report concerning the bedsores. See Agana, 2007 WL 1793786, at *1. The report
describes Carolyn Terrell, a patient who was admitted to a rehabilitation hospital for the
purpose of receiving "aggressive rehabilitation in an effort to make her stronger." The report
names two physicians, Dr. Alexander and Dr. Agana, as being involved in Carolyn's care at
the rehabilitation hospital. Her medical conditions included hypertension, diabetes mellitus,
and small cell lung cancer with metastasis to her brain. She was admitted with a foley
catheter and later described in the nurses' notes as being incontinent of bowel and bladder. 
The patient's skin was "noted to be intact" at the time of admission. Over the course of a few
days, Carolyn developed stage 2, open, excoriated, and bleeding pressure sores on the
buttocks, as well as pressure sores on the heels. The report notes that although excoriation
of the buttocks was visible on April 2, no intervention (2) was documented until April 6. The
report further describes how the skin condition moved from 'intact' upon admission to
"redness on the buttocks and a shear wound and redness on the right heel" and "very red and
skin broken - painful to touch" by April 6. At that point, Dr. Agana ordered a "low air loss
mattress," a turning schedule, and topical medication. The skin deterioration continued. On
April 17, 2006, the discharge date, the patient's buttocks were "noted to be 'extremely
excoriated due to yeast. Open, bleeding."' The nurses' notes describe Carolyn's pain as
being on a scale of seven or eight out of ten, and ten out of ten. 

 The report states that the applicable standard of care for Dr. Alexander and Dr. Agana
was the proper monitoring of Carolyn's skin condition and her related nutritional status, and
the failure to do so breached the care standard. See Agana, 2007 WL 1793786, at **5-6. 
The report not only explains the care standard, but also sets out the actions the physicians
should have taken: both physicians should have performed and monitored Carolyn's skin as
part of her daily care and should have ordered "appropriate laboratory analysis to address
[her] nutritional state." Appropriate nutritional assessment would have included blood work
to test levels of albumin and prealbumin. Although it appears blood was drawn on one
occasion, the lab results were "never received, and never followed up on." Dr. Garcia stated,
"Had [Carolyn's] attending physicians been monitoring her skin, they could have written
orders to intervene sooner and prevented further breakdown of the patient's skin." The
report also states the causation element: the failure to monitor Carolyn's skin condition and
intervene sooner caused the skin deterioration, pressure ulcers, and accompanying pain and
suffering that the nurses' notes describe as being on a scale of seven or eight out of ten and
ten out of ten. 

 Alexander argues the report is not adequate because it does not set out separately the
duties owed by each doctor or the standard of care applicable to that particular doctor. 
Instead, the report ascribes the same standard of care, breach, and causation to both
physicians. Alexander contends the report assumes the standard of care is identical for both
doctors and ignores the different roles played by attending physicians, consulting physicians,
and the hospital nursing staff. She argues the report "fails to explain how [her] actions as an
internal medicine physician, who was consulted to manage hypertension and diabetes, caused
injury to Mrs. Terrell." 

 Alexander relies on Gray v. CHCH Bayshore, L,P., 189 S.W.3d 855 (Tex. App. -
Houston [1st Dist.] 2006, no pet.). In Gray, the expert report stated, without further
explanation, that a single standard of care applied to both the hospital and the
anesthesiologist. Id. at 860. In Dr. Agana's appeal in this case, this Court discussed Gray
and the alleged failure to set forth separate standards of care for Dr. Alexander and Doctor
Agana. See Agana, 2007 WL 1793786, at *4. This Court stated, "Appellant cites no
authorities that explicitly forbid an expert from applying the same standard of care to two
physicians, when each is responsible for an overlapping aspect of a patient's care, and we are
aware of none." Id. at *5. 

 Alexander also relies on our opinion in Talmore v. Baptist Hospitals of Southeast
Texas, No. 09-06-024 CV, 2006 WL 2883124 (Tex. App.-- Beaumont Oct. 12, 2006, no
pet.). Talmore, a patient who had at least eight treating doctors, sued three of the specialist
physicians and the hospital. Id. at 3. We noted that the expert report, which did not set out
the standard of care for each specialty, should have included specific details about the
responsibilities and alleged breaches of each physician treating Talmore. Id. This case is
different. Dr. Garcia not only describes Dr. Alexander as the consulting internal medicine
doctor on the case, but also as the physician "asked to manage the patient's overall medical
conditions." The report states Dr. Alexander and Dr. Agana were both responsible for
Carolyn's daily care, which included the duty to monitor her skin condition and nutritional
status. Given Garcia's description of Alexander's role as overlapping that of Dr. Agana with
respect to skin-condition monitoring as part of the daily management of Carolyn's overall
medical condition, the trial court could reasonably conclude the report adequately set forth
the standard of care, the breach, and the causation for Dr. Alexander. 

 With respect to the bedsores, performing daily skin examinations and monitoring the
skin condition is stated to be the standard of care. The skin deterioration was noted in the
patient's records; yet the physicians did not intervene with any treatment for several days. 
Garcia indicates this lack of skin monitoring and the failure to order appropriate lab tests to
check nutritional status were breaches of the care standard. The report also sets out the
causal relationship between the breach of the standard and Carolyn's injury. According to
the report, failure to monitor the skin condition caused the bedsores and the accompanying
pain and suffering. 

 Garcia's report adequately informs Dr. Alexander of the specific conduct Terrell has
called into question, and provides a sufficient basis for the trial court to assess Terrell's
claims regarding Alexander's failure to monitor and assess the skin condition. See Palacios,
46 S.W.3d at 879. The fact that the report does not set out a different standard of care for
Dr. Alexander does not render the report inadequate under the circumstances. In this case,
the doctors are both asserted to be "attending physicians" involved in the management of
Carolyn Terrell's daily care. 

 The trial court did not abuse its discretion in denying Dr. Alexander's motion to
dismiss Terrell's survival claims regarding the alleged negligence in failing to monitor skin
condition. Because the report is inadequate to support a wrongful death cause of action, that
claim is dismissed. 




 AFFIRMED IN PART, AND REVERSED AND DISMISSED IN PART. 

 

 

 DAVID GAULTNEY

 Justice

Submitted on August 23, 2007

Opinion Delivered September 13, 2007


Before Gaultney, Kreger, and Horton, JJ. 
1. Appellant does not challenge Terrell's right to represent the estate. Dr. Benjamin
Agana and Healthsouth Rehabilitation Hospital were also defendants in the suit. In an
interlocutory appeal filed with this Court, Dr. Agana challenged the trial court's order
denying his motion to dismiss the claims against him. See Agana v. Terrell, No. 09-07-088
CV, 2007 WL 1793786 (Tex. App.--Beaumont June 21, 2007, no pet. h.). This Court issued
an opinion finding the expert's report adequate as to Dr. Agana and affirmed the trial court's
order. Id. at *1. 

2. Dr. Agana became aware of the breakdown on April 6, 2006. The report does not
indicate when, if at all, Dr. Alexander observed the skin condition.