Opinion Issued May 22, 2008















Opinion Issued May 22, 2008

 

 

 

 

 

 

 








 

     

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00655-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



SAN
 JACINTO METHODIST HOSPITAL, Appellant

 

V.

 

GUY PATRICK CARR AND TERRI CARR, Appellees

 

 



On Appeal from the 269th District Court

Harris County, Texas

Trial Court Cause No. 2006-79949

 

 



MEMORANDUM OPINION

          This
appeal arises from a medical malpractice claim brought by Appellees, Guy and
Terri Carr, against Appellant, San Jacinto Methodist
 Hospital
(Methodist).  The trial court denied
Methodist’s motion to dismiss, which asserted that the Carrs failed to satisfy
the requirements set forth in section 74.351 of the Texas Civil Practice and
Remedies Code.  See Tex. Civ. Prac. & Rem. Code. Ann. §
74.351 (Vernon
Supp. 2007).  In its sole issue,
Methodist contends that the trial court abused its discretion in ruling that
the Carrs’ expert report complies with the statute.  We affirm.

Background

          On
January 2, 2005, Guy Carr arrived at Methodist, complaining of abdominal pain
and nausea.  While receiving treatment in
the emergency room, the doctors diagnosed Carr, a diabetic, with pancreatitis,
and admitted him to the hospital under the care of Dr. Talosig.  On January 3, Carr requested a transfer to St. Joseph
 Hospital.  Upon arriving at St. Joseph, the medical staff evaluated Carr
and found that he was seriously dehydrated and his blood glucose levels were
dangerously high.  Following the efforts
at St. Joseph
to bring Carr’s glucose levels under control and to provide adequate hydration,
Carr suffered cerebral edema, which caused permanent brain damage.

          The
Carrs sued Dr. Talosig and Methodist in December 2006, alleging negligence in
the rendition of healthcare services. 
The Carrs alleged that Dr. Talosig and the nursing staff failed to
adequately monitor, assess, care for, treat and recognize Carr’s deteriorating
condition, which ultimately caused his injuries.

Carr filed expert reports from Dr.
David Hyman and Dr. Brian Tulloch as required by section 74.351 of the Texas
Practice and Remedies Code.  See id.  Dr. Tulloch’s report reads in pertinent part:

It is difficult to point to a single issue that caused
this poor man’s adverse outcome with long-standing brain damage . . .

The events that resulted in such a poor outcome hence
could with reasonable probability have occurred as a result of him being
allowed to become dehydrated by a period of inadequate insulin administration
resulted in rising blood sugar followed by inadequate intravenous rehydration
since he was NPO and hence unable to slake his developing thirst. . . .

How did this happen? 
When the kidney is faced with a sugar greater than the renal threshold
it becomes unable to automatically regulate urine output to the state of
hydration of the body.  For most subjects
the renal threshold for glucose is in the 180-200 mg/dl range, hence if the
sugar is above that level for any length of time fluid is continually lost thru
the kidney by osmotic diuresis and unless it is replaced by thirst being
quenched the body becomes dehydrated.  A
thirsty man would then need to drink more to make up for fluid lost, but as Mr.
Carr was being kept NPO to rest his inflamed pancreas, he was unable to drink
extra fluid to replace the excess body fluid lost thru uncontrolled
diureses.  Hence it was of especial
importance for the nursing & medical staff covering San
 Jacinto hospital room 330 to maintain adequate fluid balance, with
careful replacement to match urine lost to avoid dehydration.

A review of the San Jacinto
records does not show either careful replacement of lost fluid, since it seems
not to have been carefully measured or recorded, nor is there a record of
careful administration of insulin to keep sugar below the renal threshold.

A watchful physician caring for a case of pancreatitis
should be watching the laboratory values for changes in sugar and for
creatinine and electrolytes. . . 

One must therefore consider the basis for Mr. Carr’s
deterioration to have arrived when in the San Jacinto Methodist he was allowed
to progress on to develop high blood sugars by not receiving adequate insulin,
and to become hyperosmolar by his losing fluid thru the kidney that was not
replaced by adequate iv repletion during the hours while he was in bed 330.

 

Dr. Tulloch later supplemented his
report by stating:

To clarify my comments . . . it would seem to me that
[Carr’s] deterioration was not followed due to lack of adequate monitoring and
possibly also to lack of response to what developed as a period of rapid
deterioration [into] dehydration and diabetic ketoacidosis following his
admission for pancreatitis.

 

The responsibility for the gathering of that data
would in my opinion be that of the shift nurses monitoring him at the times
involved, and the medical decisions would be that of the physician charged with
his care, namely Dr. Pedro Talosig.

 

In his supplemental report, Dr. Hyman
stated:

The breaches in the standard of care set forth by
Nurse Brannan in her report were also, in reasonable medical probability, a
major cause of Mr. Carr’s injuries and resulting permanent brain damage for the
same reasons that are set forth in my February 19 report and the letter/report
of Dr. Brain R. Tulloch.

          Based
on my medical education, experience, and training; based on Mr. Carr’s medical
chart at San Jacinto Medical Hospital, based on Mr. Carr’s medical chart at St.
Joseph’s hospital, and based upon the detailed explanation provided by Dr.
Brian R. Tulloch concerning what caused Mr. Carr’s injuries and permanent brain
damage, in reasonable medical probability, the breaches of the standard of care
by Dr. Talosig’s [sic] (as set forth in my February 19, 2007 report) and the
breaches of the standard of care by the San Jacinto Methodist Hospital nursing
staff (as set forth in Nurse Sandra Brannon’s report) medically caused Mr.
Carr’s injuries and resulting permanent brain damage.

 

Carr also filed the expert report of
Sandra Brannan, a registered nurse.  It
reads in pertinent part:

I do not see that the nursing staff requested a
nasogastric tube, reported changes in vital signs to the physician, did not
monitor fingerstick blood sugar and provide insulin coverage as ordered, and I
see no recording of ECG strip or oxygen saturation, no notification of abnormal
laboratory findings, or accurate I&O.

 

I am familiar with standards of care for a patient
such as Mr. Guy Carr.  The items listed
below are breaches in the standard of care provided to Mr. Carr.  Those breaches would include, but are not
limited to:

 

Lack of frequent assessment, vital signs regularly
recorded, and changes in vital signs reported to the physician;

Record not reflecting adequate notification of the
physician concerning changes in patient status;

Changes in condition/laboratory findings not reported
in a timely manner to the physician;

Pain not assessed regularly and interventions not
provided and recorded;

Blood sugars not monitored and insulin not provided as
ordered (0800 blood 415-no insulin recorded as given, 1630 FBS 412 no recorded
coverage);

Oxygen saturation not monitored and recorded;

Nasogastric tube not placed and output not recorded;

Intake and output not monitored accurately and not
recorded; and

Education not provided and recorded.

 

With reasonable medical probability, it is my opinion
that the nursing staff at San Jacinto Methodist
 Hospital
and their actions caused or contributed to his negative outcome.

 

After receiving the supplemented
reports, Methodist objected to their sufficiency.  Methodist then moved to dismiss the Carrs’
suit, contending that the expert reports failed to comply with the requirements
of section 74.351.  See id.  Dr. Talosig moved to dismiss the suit against
him as well, which the trial court denied. 
Dr. Talosig does not appeal the trial court’s ruling against him.  The trial court denied Methodist’s motion to
dismiss, and Methodist appealed.

Discussion

          In
its sole issue, Methodist contends that the trial court erred in its
determination that the Carrs’ expert reports complied with section 74.351 of
the Civil Practice and Remedies Code. 
Specifically, Methodist asserts that the expert reports fail to identify
adequately the standard of care or to describe the causal relationship between
Methodist’s alleged negligence and Carr’s injuries.  The Carrs respond that Methodist waived any
objection to their expert reports and that the trial court did not abuse its
discretion in concluding that the suit against Methodist may proceed.

Preservation of Error

          The
Carrs first contend that Methodist waived any objection to their expert reports
by failing to object within twenty-one days after receiving the reports.  Methodist did not object to the reports until
it received Dr. Hyman’s and Dr. Tulloch’s supplement to their reports.  Although Methodist did not object to the
initial expert reports, Methodist can object to the reports on appeal because
the Carrs did not raise the issue of waiver in their response to Methodist’s
motion to dismiss.  As such, the issue
was not before the trial court when it made its decision, and we may not
consider it on appeal.  Hansen
v. Starr, 123
S.W.3d 13, 18 (Tex.
App.—Dallas 2003, pet. denied) (citing Thompson v. Haberman, 739 S.W.2d
71, 72 (Tex. App.—San Antonio 1987, orig. proceeding).

Standard of Review

          We
review section 74.351 rulings under an abuse of discretion standard.  Am. Transitional Care Ctrs. v. Palacios,
46 S.W.3d 873, 877 (Tex. 2001)  (predecessor statute); Gray
v. CHCA Bayshore L.P., 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial
court abuses its discretion if it acts in an arbitrary or unreasonable manner
without reference to guiding rules or principles.  See Garcia v. Martinez,
988 S.W.2d 219, 222 (Tex.
1999). When reviewing matters committed to the trial court’s discretion, we may
not substitute our own judgment for that of the trial court.  Bowie
Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its
discretion merely because it decides a discretionary
matter differently than an appellate court would in a similar circumstance.  Gray, 189 S.W.3d at 858.  However, “a trial court has no ‘discretion’ in determining
what the law is or in applying the law to the facts.” Walker
v. Packer, 827 S.W.2d 833, 840 (Tex. 1992).  

Section 73.541 of the Texas Practice and
Remedies Code

          Pursuant
to section 74.351, medical malpractice plaintiffs must provide each defendant
physician and health care provider with an expert report.  See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(a).  An expert report means a “written report by
an expert that provides a fair summary of the expert’s opinions as of the date
of the report regarding applicable standards of care, the manner in which the
care rendered by the physician or health care provider failed to meet the
standards, and the causal relationship between that failure and the injury,
harm, or damages claimed.”  Id. §
74.351(r)(6).  A claimant may satisfy the
requirements of an expert report by serving reports of separate experts as to
each issue.  See id. § 74.351(i).  A
defendant may file an objection to the sufficiency of the report not later than
the 21st day after the date it was served. 
Id.
§ 74.351(a).  A trial court shall grant a
motion challenging the adequacy of the expert report only if it appears to the
court, after hearing, that the report does not represent an objective good
faith effort to comply with the statutory definition of an expert report.  Id.
§ 74.351(l).

          Although
the report need not marshal all the plaintiff’s proof, it must include the
expert’s opinions on the three statutory elements—standard of care, breach, and
causation.  See Palacios, 46
S.W.3d at 878–79.  In detailing these
elements, the report must provide enough information to fulfill two purposes if
it is to construe a good faith effort.  Id. at 879. 
First, the report must inform the defendant of the specific conduct that
the plaintiff has called into question.  Id. Second, the
report must provide a basis for the trial court to conclude that the claims
have merit.  Id. 
A report that merely states the expert’s conclusions as to the standard
of care, breach, and causation does not fulfill these two purposes.  Id.  The expert must explain the basis for his
statements and must link his conclusions to the facts.  Bowie
Mem’l Hosp., 79 S.W.3d at 52. 
Furthermore, in assessing the report’s sufficiency, the trial court may
not draw any inferences and must instead rely exclusively on the information
contained within the report’s four corners. 
See Palacios, 46 S.W.3d at 878. 
A report that omits any of the statutory requirements is not a good
faith effort to comply with the Act.  Id.
at 879.  A trial court must dismiss a
cause if it determines that the report does not represent a good faith effort
to comply with the statute’s requirements.  See
Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex. 2003).

Nurse Brannan’s Report

          Methodist
contends that Nurse Brannan’s report inadequately describes the standard of
care and cannot be used to prove causation. 
The Texas Civil Practice and Remedies Code states that “a person may
qualify as an expert witness on the issue of the causal relationship between
the alleged departure from accepted standards of care and the injury, harm, or
damages claimed only if the person is a physician.”  Tex.
Civ. Prac. & Rem. Code Ann. § 74.403(a).  A registered nurse is not a physician.  See id.
§ 74.001 (23).  Consequently, Brannan’s
report can be used to explain the standard of care and any breach of the
standard of care by a nurse but cannot be used as proof of causation.  See id.
§74.402(b).  

          Brannan
lists several ways in which she opines that Methodist breached the standard of
care, including the failure to monitor Carr’s blood sugar, to provide insulin
as ordered by the physician, to report findings to the physician, and to
adequately monitor fluid intake and output for a known diabetic who was not
allowed to drink in order to rest his inflamed pancreas.  Rather than merely stating that Methodist did
not adequately monitor Carr, Brannan sets out the specific duties that the
nursing staff had and the way in which Methodist failed to complete them.  Cf.
Gray, 189 S.W.3d at 859 (holding report insufficient on standard of care
because it contains only a general statement that appellees failed to monitor
appellant’s knee properly).  The trial
court did not abuse its discretion in ruling that the report adequately described
the standard of care and its breach because the report sets out a fair summary
of “what care was expected but not given.” 
See Palacios, 46 S.W.3d at
880.

Dr. Tulloch’s Report

          Methodist
further contends that Dr. Tulloch’s report does not satisfy the statutory
requirements on the issue of causation. 
Dr. Tulloch’s report states that it was “of especial importance for the
nursing and medical staff covering San Jacinto
room 330 to maintain adequate fluid balance, with careful replacement to match
urine lost to avoid dehydration.  A
review of the San Jacinto records does not
show either careful replacement of lost fluid, since it seems not to have been
carefully measured or recorded, nor is there a record of careful administration
of insulin to keep sugar below the renal threshold.”  It further states that the events that
resulted in such a poor outcome “could with reasonable medical probability have
occurred as a result of him being allowed to become dehydrated by a period of
inadequate insulin administration [sic] resulted in rising blood sugar followed
by inadequate intravenous rehydration since he was NPO and hence unable to
slake his developing thirst.”

          Tulloch
followed his initial report up by writing a supplemental letter, in which he
stated that Carr’s condition was a result of his care at Methodist, and his
deterioration “was not followed due to lack of adequate monitoring and possibly
also to lack of response to what developed as a period of rapid deterioration
[into] dehydration and diabetic ketoacidosis.” 
The letter continues by stating that “the responsibility for the
gathering of that data would in my opinion be that of the shift nurses
monitoring him at the times involved, and the medical decisions would be that
of the physician charged with his care.” 


Methodist contends that the report
contains gaps that prevent it from being a “fair summary” because it fails to
explain how any act or omission by Methodist caused any injury to Carr.  We disagree. 
According to Nurse Brannan’s report, the nursing staff had the
responsibility to monitor Carr’s blood sugar and provide insulin, to monitor
his intake and output, and to report timely any changes in his condition to the
physician but failed to do so.  According
to Tulloch’s report, this failure led to Carr’s deterioration.  When read together, Carr’s experts delineate
how Methodist’s actions or omissions, apart from the physician’s, caused Carr’s
injuries.  Unlike in Bowie,
upon which Methodist relies, Tulloch’s report does not merely state that if
Carr had been properly monitored, Carr would have had the possibility of a
better outcome.  See Bowie,
79 S.W.3d at 52–53.  The report
specifically addresses Tulloch’s opinion that Methodist’s failure to adequately
monitor Carr’s fluid intake and glucose levels and to provide insulin as
ordered led to his dehydration and high blood sugar levels and that those
failures led to brain swelling as a complication from efforts to reverse his
dehydrated condition.  It thus adequately
puts Methodist on notice of the specific conduct called into question.  See
Palacios, 46 S.W.3d at 879.  

We conclude that Dr. Tulloch’s report
provides a fair summary of his opinion that a causal relationship exists
between San Jacinto Methodist’s failure to meet the pertinent standard of care
and the Carrs’ damages.  Accordingly, we
hold that the trial court did not abuse its discretion in denying Methodist’s
motion to dismiss the Carrs’ health care liability claims.[1]

Conclusion

          We
hold the trial court did not abuse its discretion in concluding that the Carrs’
expert reports satisfied the requirements of section 74.351.  We therefore affirm the judgment of the trial
court.

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Jennings and Bland.











[1]           Because
we hold that Nurse Brannan’s and Dr. Tulloch’s report adequately summarize the standard
of care, breach, and causation, we do not address Dr. Hyman’s report.