**BAYLOR UNIVERSITY MEDICAL CENTER, Edmund Sanchez, M.D., and Srinath Chinnakotla, M.D., Appellants**

v.

**Harold BIGGS, Individually and as Executor of the Estate of Cheri Jean Wells Biggs, Deceased, Branden Wells, and Cher Biggs, Appellees.**

No. 05–06–01104–CV.

Court of Appeals of Texas, Dallas.

Nov. 9, 2007.

R. Brent Cooper, John A. Scully, Michelle E. Robberson, Cooper & Scully, P.C., Derek S. Davis, Ty Alan Bailey, Michael A. Yanof, Stan Thiebaud, Stinnet, Thiebaud & Thieved, LLP., Dallas, for Appellant.

Edward D. Fisher, Beaumont, Willie Charles Briscoe, Joseph J. Fisher, Joe Kendall, Provost Umprhey Law Firm. L.L.P., Dallas, for Appellee.

Before Justices WRIGHT, LANG–MIERS, and MAZZANT.

## OPINION ON MOTION FOR REHEARING

Opinion by Justice LANG–MIERS.

Appellants' motion for rehearing is denied. We withdraw our opinion of August 28, 2007, and vacate our judgment of that date. This is now the opinion of the Court.

In this interlocutory appeal, Baylor University Medical Center; Edmund Sanchez, M.D.; and Srinath Chinnakotla, M.D. challenge the trial court's order denying their motions to dismiss medical malpractice claims filed by Harold Biggs, Individually and as Executor of the Estate of Cheri Jean Wells Biggs, Deceased; Branden

Wells, Cheri Biggs's son; and Cher Biggs, Cheri Biggs's daughter (collectively, the family). Appellants argue the family's expert reports do not comply with section 74.351(r)(6) of the Texas Civil Practice and Remedies Code because the reports do not contain a fair summary of the experts' opinions on the standard of care, alleged breach of that standard, and causal link between any alleged breach and the injuries claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2007). We agree. Accordingly, we reverse the trial court's order denying appellants' motions to dismiss, and we remand to the trial court for a determination of whether the appellees' request for an extension should be granted. *See id.* § 74.351(c).

## BACKGROUND

On May 2, 2004, a patient of a Texarkana hospital died and his family donated his organs. Dr. Chinnakotla, a transplant surgeon at Baylor, flew to Texarkana to harvest the donor's kidneys for transplantation at Baylor. On May 4, one of the donor's kidneys was transplanted into Cheri Biggs. After the surgery, Biggs's follow-up tests were normal until May 20, when Biggs began to experience complications. After her discharge on May 27, Biggs experienced additional complications, ultimately resulting in her hospitalization on June 1. Biggs's condition continued to deteriorate, and she was pronounced dead on June 9. The parties agree that the medical records show Biggs died from the transplantation of a rabies-infected kidney.

The family sued Baylor, Dr. Sanchez, and Dr. Chinnakotla for medical malpractice. Contemporaneously with the filing of their lawsuit, and pursuant to chapter 74 of the civil practice and remedies code, the family filed two medical expert reports. Appellants objected to the reports, contending the reports did not comply with section 74.351(r)(6) because they did not state the applicable standard of care, the alleged breach, or how the alleged breach proximately caused Biggs's death. In response to these objections, the family provided supplemental expert reports. Appellants objected to the supplemental expert reports on the same grounds, and Drs. Sanchez and Chinnakotla also challenged the qualifications of one of the experts. Appellants each moved to dismiss the lawsuit, contending the expert reports were insufficient under section 74.351(r)(6) as a matter of law. The trial court denied appellants' motions, and appellants filed this interlocutory appeal.

## CLAIM OF FAILURE TO OBTAIN INFORMED CONSENT

The family alleges Biggs would have declined the kidney if appellants had informed her about the donor's high-risk social and medical history, including specifically the information about his condition when he presented at the emergency room and after he was admitted to the hospital.[1] They also allege they were not told that

1. The family alleges that the donor's social history included "ingestion of cocaine, prior to his admittance to the hospital, in such an amount that it contributed to cause his death. Furthermore, [the donor's] family admitted that he smoked marijuana daily, had been in prison in the State of Texas recently, had homemade tattoos, and smoked crack cocaine.... [The donor's] 'high risk' medical history includes but is not limited to his 106 degree temperature, prior to his death, indi-

cating an obvious and serious infection that was unknown to [appellees, his] treating physicians and all [appellants]. Furthermore, [his] lab tests show virtually no normal levels in any of the fields tested. Lastly, [his] lab tests showed a serious unknown rare staphylococcal positive organism. It was also noted that [the donor] may have suffered from rhabdomyolysis and that was not proven negative prior to the transplant surgery."

the transplant center offered the donor's kidneys to several hospitals and that those hospitals declined the organs because of the donor's high-risk social history, recent incarceration, and overall poor donor quality. The family further contends Baylor was negligent by failing to develop, implement, and enforce effective policies and procedures and/or standard guidelines for physicians regarding informed consent as it applied to high-risk donors.

A claim based on failure to obtain informed consent is governed by section 74.101 of the civil practice and remedies code:

> In a suit against a physician or health care provider involving a health care liability claim that is based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.101 (Vernon 2005); see Binur v. Jacobo, 135 S.W.3d 646, 653 (Tex.2004).[2]

■ Because the Texas Medical Disclosure Panel has not specifically determined what risks or hazards must be disclosed prior to kidney transplant surgery, the parties agree that the duty in this case is to "disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent."[3] See TEX. CIV. PRAC. & REM.CODE ANN. § 74.101. In such a situation, "the plaintiff must prove by expert testimony that the medical condition complained of is a risk inherent in the medical procedure performed" and the "risk is material in the sense that it could influence a reasonable person's decision to consent to the procedure." Barclay v. Campbell, 704 S.W.2d 8, 9–10 (Tex.1986).

■ The statute does not define "risk" or "hazard." The ordinary meaning of the term "risk" is "the possibility of loss, injury." WEBSTER'S THIRD NEW INT'L DICT. 1961 (1981); see Tajchman v. Giller, 938 S.W.2d 95, 98 (Tex.App.-Dallas 1996, writ denied). The ordinary meaning of the term "hazard" is "a thing or condition that

---

2. This lawsuit arises under the informed consent and expert report provisions of chapter 74. See TEX. CIV. PRAC. & REM.CODE ANN §§ 74.101, 74.351 (Vernon 2005). Chapter 74 recodified the former law, article 4590i, concerning medical liability. See Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2048, 2050 (subsequent amendments omitted) (former TEX.REV.CIV. STAT. ANN. art. 4590i), repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (now codified at TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.101–.106 (Vernon 2005)). In the recodification, the legislature did not make substantive changes to the provisions at issue in this case. Accordingly, we conclude that cases discussing these former provisions under article 4590i are relevant to our analysis of this case. See Simonson v. Keppard, 225 S.W.3d 868

(Tex.App.-Dallas 2007, no pet.) (citing cases decided under article 4590i in analysis of provisions of chapter 74); CHCA Mainland L.P. d/b/a Mainland Med. Ctr. v. Burkhalter, 227 S.W.3d 221 (Tex.App.-Houston [1st Dist] 2007, no pet.) (same); Apodaca v. Russo, 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.) (same).

3. Section 74.106(b) of the civil practice and remedies code states that when the Texas Medical Disclosure Panel has not specifically determined what risks and hazards must be disclosed prior to a particular procedure, the duty is that "otherwise imposed by law." See TEX. CIV. PRAC. & REM.CODE ANN. § 74.106(b) (Vernon 2005). The duty "otherwise imposed by law" in this informed consent case is that imposed by section 74.101. See id. § 74.101; Jacobo, 135 S.W.3d at 654–55.

might operate against success or safety." WEBSTER'S THIRD NEW INT'L DICT. 1041; *see Giller*, 938 S.W.2d at 98. A risk or hazard is inherent in the informed consent context if it "is one which exists in and is inseparable from the [procedure] itself." *Barclay*, 704 S.W.2d at 10 (inherent risk arises from use of drug and not from defect in drug or negligent human intervention). Additionally, the expert should "testify to all other facts concerning the risk which show that knowledge of the risk could influence a reasonable person in making a decision to consent to the procedure." *Id.* at 9 (quoting *Peterson v. Shields*, 652 S.W.2d 929, 931 (Tex.1983)).

## Is The Expert Qualified?

■ In their first issue, Drs. Sanchez and Chinnakotla contend that William M. Bennett, M.D., one of the family's experts, is not qualified to render an opinion in this case. The doctors argue that Dr. Bennett is a practicing nephrologist, not a transplant surgeon, and that his curriculum vitae and report do not indicate he is familiar with surgical standards of care or that he obtains surgical consent for kidney transplants.

### Standard of Review

■ The trial court has broad discretion to determine admissibility of expert testimony. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex.2006). We will not reverse the trial court's ruling absent a clear abuse of that discretion. *Id.* A trial court abuses its discretion only if it acts arbitrarily or capriciously, without reference to any guiding rules or principles. *Id.*

### Qualifications of an Expert

■ Only a physician who satisfies specific requirements may qualify as an expert witness on the issue of whether another physician departed from accepted standards of medical care in a health care liability claim against that physician for injury to a patient. Section 74.401 provides that, to be qualified as an expert, the physician

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a) (Vernon 2005). "Practicing medicine"

includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

*Id.* § 74.401(b).

In determining whether an expert is qualified on the basis of training or experience,

the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id.* § 74.401(c).

■ To comply with section 74.401's requirements, the proponent of the expert's testimony has the burden to show "that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise*,

924 S.W.2d 148, 153–54 (Tex.1996) (quoting *Ponder v. Texarkana Mem'l Hosp.*, 840 S.W.2d 476, 477–78 (Tex.App.-Houston [14th Dist.] 1991, writ denied)).

## Analysis

■ Dr. Bennett's curriculum vitae and report show that he is board certified in nephrology and has been a transplant physician since 1970. He is the director of renal transplantation at Legacy Health Systems in Portland, Oregon and is a member of the American Society of Transplantation. He has contributed to medical literature on the subjects of experimental and clinical transplantation. Although Dr. Bennett's curriculum vitae and report state he is a transplant physician, they do not specifically state he has training and experience as a transplant surgeon, or that he has training and experience in obtaining informed consent from patients awaiting transplant surgery. But the focus "is on the 'fit' between the subject matter at issue and the expert's familiarity" with it, "not on a comparison of the expert's title or specialty with that of the defendant or a competing expert." *Broders*, 924 S.W.2d at 153 (quoting *Nunley v. Kloehn*, 888 F.Supp. 1483, 1483 (E.D.Wis.1995)). And Dr. Bennett's curriculum vitae and report do state that he is the director of a kidney transplant program.

The Texas Supreme Court has stated that "expert qualifications should not be too narrowly drawn." *Larson*, 197 S.W.3d at 305. Whether the trial court should have sustained appellants' objections to Dr. Bennett's qualifications and excluded his report is a close call. *See id.* at 304. Close calls go to the trial court. *Id.*

We overrule Drs. Sanchez's and Chinnakotla's first issue.

### ARE THE EXPERT REPORTS ADEQUATE?

In Baylor's sole issue and Drs. Sanchez's and Chinnakotla's second issue, appellants argue the trial court erred by refusing to dismiss the family's claims because the expert reports are inadequate under section 74.351(r)(6).

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam); *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 875 (Tex.2001). We may not substitute our judgment for that of the trial court. *See Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992)). A trial court does not abuse its discretion merely because it decides a discretionary matter differently from an appellate court under similar circumstances. *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker*, 827 S.W.2d at 840. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

## Contents of Expert Reports in Health Care Liability Claims

■ A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) (Vernon Supp.2007). An "expert report" is one that

provide[s] a fair summary of the expert's opinions regarding applicable standards of care; the manner in which the care rendered by the physician or health care

provider failed to meet the standards; and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). If a report omits any of these statutory elements, it cannot be a good faith effort. *Palacios,* 46 S.W.3d at 879. The report must fulfill the dual purpose of notifying each defendant of the specific conduct called into question and providing support for a trial court to conclude the claims have merit. *See id.* at 878–79; *Gray,* 189 S.W.3d at 859. In determining whether the report represents a good faith effort, the trial court's inquiry is limited to the four corners of the report. *Eichelberger v. Mulvehill,* 198 S.W.3d 487, 489–90 (Tex.App.-Dallas 2006, pet. denied) (citing *Univ. of Tex. Sw. Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.)). The report must specifically identify the person whose conduct the plaintiff is calling into question and show how that person's conduct constituted negligence. *Dale,* 188 S.W.3d at 879. And when a plaintiff sues more than one defendant in a health care liability claim, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.351(a), (r)(6); *see Jernigan,* 195 S.W.3d at 94; *Eichelberger v. St. Paul Med. Ctr.,* 99 S.W.3d 636, 638 (Tex.App.-Dallas 2003, pet. denied); *Whitworth v. Blumenthal,* 59 S.W.3d 393, 396–97 (Tex.App.-Dallas 2001, pet. dism'd by agr.). If a trial court concludes the expert reports are deficient, it has the discretion to grant one 30–day extension to the claimant in order to cure the deficiency. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c).

## Analysis

### A. *The family's experts*

To support their claim that Biggs would have declined the donor's kidney if appellants had informed her about the donor's high-risk social and medical history, the family submitted initial and supplemental reports from experts Dr. Bennett and Youmin Wu, M.D., a transplant surgeon at the University of Arkansas for Medical Sciences in Little Rock, Arkansas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

### 1. *Dr. Wu's report*

In his report, Dr. Wu states with regard to the standard of care: [4]

I am well aware of UNOS' regulations and CDC Guidelines requiring the Host OPO to obtain a thorough history on each potential donor in an attempt to determine whether the potential donor is in a "high risk" group as defined by the Centers for Disease Control. After doing so, the Host OPO must communicate the donor history and high-risk status to all potential recipient institutions:

When a transplant center receives a high risk kidney offer by the OPO and the transplant surgeon decides to accept the kidney, standard practice for a renal transplant service is that the transplant surgeon must either inform the recipient themselves or inform the recipient by transplant coordinator. The patient is usually informed of the donor's high risk status and consent is obtained from the potential recipient before they are admitted to the hospital for transplant in an effort to minimize ischemic time for the organ. If a patient gives consent to receive an organ from a high-risk donor, as defined by the CDC, that consent

---

4. Dr. Wu's supplemental report adds only the words "this is the standard of care in the organ transplant service."

would be well documented in the medical records.

* * *

The host OPO must communicate[ ] the donor history to all institutions receiving organs from the high-risk donor and informed consent regarding the possibility of transmission of a transmissible disease should be obtained from the recipient in compliance with UNOS policy 4.1.1, UNOS policy 4.1.3 and UNOS policy 4.6.1.

With regard to breach of that standard, Dr. Wu states:

After reviewing Cheri Biggs' entire medical records from Baylor Medical Center and Dallas Transplant Institute as well as the Southwest Transplant Alliance records provided to me, I did not see any documentation that indicated the surgeon or transplant team had spoken with the patient or her family, to inform the patient or her family that this kidney was, in fact, from a high risk donor transplant situation. There is no indication that Mrs. Biggs or her family was informed that the organs had been turned down by several other transplant centers due to poor donor quality and his high risk behaviors.

* * *

In this particular case, I have seen no indication that Cheri Biggs, or her family, was informed about the donor's high risk status. Accordingly, it is my professional opinion that the transplant surgeons deviated from the standard of care, UNOS policy and CDC guidelines in transplanting this high risk cadaveric kidney, without first disclosing the donor's high risk status and obtaining informed consent from Cheri Biggs.

### 2. Dr. Bennett's report

With regard to the standard of care, Dr. Bennett states:

If a potential donor is known to be practicing high-risk behavior, this fact should be disclosed to the accepting surgeons at the receiving transplant center. In my view, the receiving surgeon has a medical and ethical obligation when calling in potential recipients to explain any particular risks that an individual donor poses for a potential recipient. . . . [T]he standard of care at transplant centers in Texas and the United States, including ours, still requires a discussion is held between the surgeon or physician who calls the patients into the hospital for the procedure and the patient regarding the characteristics of that donor organ. In the United States, the use of expanded donors, patients over the age[ ] of 50, those with a history of treated hypertension and or diabetes, are sometimes acceptable as donors but the recipient needs to be willing and give consent to accept because this type of kidney may have a compromised long-term outcome with a transplant. In addition, patients with possible infectious disease risks based on high risk behavior such as current drug use or even a history of drug use may be exposed to infectious diseases such as HIV and/or hepatitis C. They may be in the window between infections with these viruses and the actual clinical symptoms and serological markers of infection. If this is the case, the recipient needs to be counseled that there is a small but finite risk of transmission of either HIV or hepatitis C since these individuals are most likely to have unprotected sex and intravenous drug use.

In his supplemental report, Dr. Bennett added:

I believe that I have set forth the proper standard of care for a transplant physician concerning informed consent to a patient who is to receive donor organs. It is customary to share with the patient

and/or their family the information regarding the suitability of the donor. I feel that this is an obligation both medically and ethically so a potential recipient of organs at high risk for transmission of infection can be made aware so that they can decide to proceed according to their own standards and judgment of the risks.... As mentioned above, virtually all medical centers share this information through the physician or surgeon with a prospective recipient and get their agreement to take these added risks to kidney transplantation....

With regard to the breach of that standard, Dr. Bennett states:

It is not clear from the medical records what communication was done between the accepting surgeons in Dallas and the prospective recipient, Ms. Biggs. To the extent that Ms. Biggs was informed about the risks of transplantation using Mr. Beed as a donor and accepted these risks there was no violation of the standard of care. If Ms. Biggs was not informed about these risks it would have violated our procedure and the standard of centers procedure for involving the recipient in the decision to accept what could be described as organs from a high risk donor. The high risk status was not on the basis of any suspicion of rabies but instead was on the basis of current drug use and abuse, fever, positive blood cultures, and a high risk behavior that may have placed the recipient at risk for infection and placed her in the window of infection from HIV and HCV even though the initial aerologies were negative. The rejection of the organs by other centers should have been disclosed. If the informed consent was not obtained it would in my view be below the standard of what is practiced at transplant center in the United States particularly for donors who are in high-risk categories.

**B.** *Adequacy of expert reports as to Baylor*

■ Baylor argues it did not have a duty to obtain Biggs's informed consent in this case because that duty is imposed solely upon the treating doctor and is non-delegable. The family responds that Baylor assumed the duty to obtain informed consent by allowing its nurses to obtain Biggs's informed consent without the presence of the doctors. We conclude we do not need to address these issues because both parties raise these issues for the first time on appeal. *See* TEX.R.APP. P. 33.1.

■ Baylor also argues the family's expert reports are deficient on the family's allegation that Baylor was negligent by failing to develop, implement, and enforce effective policies and procedures for obtaining informed consent in cases of high-risk donors. We agree the reports are deficient on this theory of liability.

Drs. Bennett and Wu do not refer to Baylor by name in their reports other than to say they reviewed Baylor's records. The expert reports do not contain a statement of the standard of care, breach, or causation applicable to Baylor on any of the theories raised by the pleadings. Because the reports omit the required elements of an expert report with regard to Baylor, they do not comply with section 74.351(r)(6). *See Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859 (expert report must provide specific information about what each defendant should have done differently). As a result, the reports are deficient and the trial court abused its discretion by denying Baylor's motion to dismiss.

Baylor asks us to reverse the order of the trial court and render judgment dismissing the family's claims against Baylor. We decline to do so. The reports are deficient, but they were timely filed. Additionally, the family requested an exten-

sion under section 74.351(c) if the reports were found deficient. Because the trial court did not find the reports deficient, the court did not have a reason to consider the family's request for an extension. We conclude it is appropriate for the trial court to determine whether appellees should be granted an extension in which to cure the deficiencies. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *see also Leland v. Brandal,* 217 S.W.3d 60, 64–65 (Tex.App.-San Antonio 2006, pet. granted); *Longino v. Crosswhite,* 183 S.W.3d 913, 918 n. 2 (Tex.App.-Texarkana 2006, no pet.); *Haddad v. Marroquin,* No. 13–07–014–CV, 2007 WL 2429183, at *6 (Tex.App.-Corpus Christi Aug.29, 2007, pet. filed) (memo.op.).

We sustain Baylor's sole issue, reverse the order of the trial court denying Baylor's motion to dismiss, and remand to the trial court for its consideration of the family's extension request.

C. *Adequacy of expert reports as to Drs. Sanchez and Chinnakotla*

Drs. Sanchez and Chinnakotla initially argue they were not obligated to disclose to Biggs a risk of contracting rabies because rabies is not an inherent risk in a kidney transplant procedure. In response, the family argues this case is not about rabies. They argue the doctors had information about the donor's symptoms and possible medical conditions at death and should have disclosed that information and let Biggs decide whether to give or withhold consent.

It is undisputed that Drs. Sanchez and *Chinnakotla could not have known the* donor had rabies prior to performing transplant surgery on Biggs. However, the family alleges that the donor presented symptoms of a very serious illness that

may have resulted in his death: he had a 106–degree fever, persistent vomiting, seizures, a confused mental state, his lab tests were positive for "a rare staphylococcal" organism and rhabdomyolysis.[5] And Dr. Bennett states the medical records showed the donor

> ingested an unknown quantity of rock cocaine two days prior to admission. He made several emergency room visits and on the third visit was noted to have altered mental status. He rapidly deteriorated and was pronounced brain dead on May 2, 2004. Blood cultures returning on May 2, 2004, grew gram-negative rods ... The procuring team felt that the recipient surgeon should be aware of a sputum growing the hemophilus influenza bacteria and the possibility of r[h]abdomyolysis in the donor. Cultures from May 2 of the blood, urine and sputum showed the aforementioned gram-negative growth and a rare staphylococcal coagulase positive organism. ... He was thought to have died of intracranial hemorrhage. He did have seizures, cocaine induced myocardial infarction, probably aspiration and had a significant past history of cocaine abuse. He had been incarcerated several weeks prior to the fatal illness. ... In the emergency room, ... he was admitted in an agitated and confused state and he had multiple episode[s] of vomiting. He had ingested an unknown quantity of rock cocaine in an attempt to hide it from law enforcement officers. A urine screen was positive for cocaine and cannabinoids. He continued to exhibit confusion and agitation and was intubated for airway protection because of persistent vomiting. ... He was given anticon-

---

**5.** Rhabdomyolysis is "the destruction or degeneration of muscle tissue, as from a traumatic injury, excessive exertion, or a stroke, that sometimes leads to acute renal failure." MERRIAM-WEBSTER ONLINE DICT.; *see Tex. Work-* ers' *Comp. Ins. Fund v. Tex. Workers' Comp. Comm'n,* 124 S.W.3d 813, 816 (Tex.App.-Austin 2003, pet. denied) (describing worker's injuries as including "rhabdomyolysis (muscle degeneration) with acute renal failure").

vulsants. He continued to have tonic clonic seizure activity by EEG. . . .

The family alleges the donor potentially had a serious contagious infection and a medical condition that can cause kidney failure and that these conditions were not disclosed to Biggs prior to surgery. Although the family's experts do not state that the donor's possible medical conditions posed an inherent actual or theoretical risk or hazard to a transplant recipient by virtue of receiving an organ from this donor, the experts do state that this is information that should have been disclosed. We first address whether the family's expert reports are adequate as to Drs. Sanchez and Chinnakotla.

### 1. Standard of care

 Regarding the standard of care, both reports state the "transplant surgeon" should have disclosed the donor's high-risk status to Biggs prior to surgery to give Biggs an opportunity to make an informed decision about whether to accept the kidney. However, neither report states which transplant surgeon was obligated to disclose this information, Dr. Sanchez or Dr. Chinnakotla. Baylor's pleadings indicate Dr. Sanchez was Biggs's treating surgeon, and the family's pleadings do not contest this allegation. However, in reviewing the adequacy of expert reports, we are limited to the four corners of the report. See Eichelberger, 198 S.W.3d at 489–90. Although Dr. Bennett's report states Dr. Chinnakotla harvested the kidney from the donor, neither report states which transplant surgeon owed the duty to obtain her informed consent.

 Dr. Bennett states the "receiving surgeon has a medical and ethical obligation when calling in potential recipients to explain any particular risks that an individual donor poses for a potential recipient." But Dr. Bennett does not refer to either Dr. Sanchez or Dr. Chinnakotla as the "receiving surgeon." Additionally, Dr. Wu does not refer to either doctor by name. He refers to the "transplant surgeon" who "accept[s] the kidney," and, at one point, to the "transplant team." When an expert opines about the care provided by more than one physician, the report must refer to each physician by name and state the standard of care with regard to that physician. See Gray, 189 S.W.3d at 859. Additionally, Dr. Bennett does not state whether the "particular risks" to which he referred are the same as the inherent risks that must be disclosed.

We conclude the family's expert reports do not satisfy the requirements of section 74.351(r)(6) with regard to the standard of care.

### 2. Breach of the standard of care

 Regarding the breach of the duty to obtain informed consent, Drs. Bennett and Wu state in their reports that they reviewed Biggs's medical records, records from the transplant institutions, and medical information about the donor, and both state they could not find any documentation that Biggs was informed about the donor's high-risk status.[6] Dr. Bennett also states there is no indication in the records that Biggs was informed that other transplant institutions/recipients declined the organs.[7]

---

6. The medical records, information about the donor, and informed consent forms are not part of the appellate record.

7. Dr. Bennett notes in his report that the medical records show the donor's "heart was offered to two potential center/recipients and was turned down based on donor social history. The lungs were turned down by one center because of 'donor quality.' The liver was turned down by one center because of donor ABO. The kidneys were offered to four potential kidney/pancreas recipients and turned down because of 'donor quality.' "

Dr. Bennett concluded the records were not clear about what communication was made between appellants and Biggs concerning informed consent. He said the transplant surgeon breached the standard of care if Biggs was not informed about the donor's high-risk nature, but did not breach the standard of care if she was informed. Neither expert states that he actually reviewed the informed consent forms. These experts state they do not know whether Biggs was informed about the donor's history. They do not state whether either doctor breached a duty to inform Biggs of this information.

We conclude the family's expert reports do not comply with the statute's requirements concerning breach of the standard of care.

### 3. Causation

■ With regard to the third required element of an expert report, Drs. Sanchez and Chinnokotla argue the reports do not establish a causal link between the donor's medical history and Biggs's death from rabies. The family argues the legislature "removed 'lack of informed consent' causation from the expert battle arena and, instead, funneled it through whether a 'reasonable patient' would have consented to the procedure." As support, they cite cases that discuss the legislative change in the standard from whether a physician in a certain community would provide certain disclosures to whether the disclosures could have influenced a reasonable person in deciding whether to consent to a certain medical procedure. *See generally Winkle v. Tullos*, 917 S.W.2d 304 (Tex.App-Houston [14th Dist.] 1995, writ denied); *Greene v. Thiet*, 846 S.W.2d 26 (Tex.App.-San Antonio 1993, writ denied) (op. on reh'g). However, the change in the law did not eliminate the longstanding requirement to establish causation between the undisclosed inherent risks and the injuries suffered. *See McKinley v. Stripling*, 763 S.W.2d 407, 409–10 (Tex.1989) (proximate cause remains element of cause of action based on failure of doctor to inform patient of inherent risks associated with surgical procedure); *Greene*, 846 S.W.2d at 34–35 (eliminating element of causation "would, in effect, impose strict liability upon the treating physician contrary to *McKinley*."). Instead, the expert report must include a fair summary of the expert's opinion regarding the causal relationship between "that failure [of care rendered] and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

■ There are two separate parts to the causation analysis in informed consent cases. The first part is whether a reasonable person could have been influenced to decide to give or withhold consent by being informed of the risks or hazards that were not disclosed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.101; *Greene*, 846 S.W.2d at 31. The second part is whether the injury complained of was caused in fact by the undisclosed risk. *Greene*, 846 S.W.2d at 31.

Dr. Wu's report does not address causation at all and does not comply with the statute's requirements concerning causation. Only Dr. Bennett's supplemental report addresses causation, but not with the specificity required:

In the case of Ms. Biggs, she was denied the opportunity to know that the potential donor had been recently incarcerated, had been recently using illicit drugs and had recently had a systemic infection.... In the case of Ms. Biggs, she might have declined the organs that ultimately cost her her life. I believe this is standard transplant practice in Texas, Oregon and everywhere in the country. The lack of an opportunity to turn down these organs caused the death of Cheryl Biggs although not for reasons that

could have been ascertained at that time.

Dr. Bennett states Biggs was denied "an opportunity to turn down these organs" because she was not informed about the donor's history. But the standard is whether a reasonable person, not Biggs, could have been influenced by information about the donor's condition. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.101. Additionally, Dr. Bennett does not connect the donor's symptoms to Biggs's death. *See Jacobo*, 135 S.W.3d at 654. In fact, he concludes that the actual cause of Biggs's death could not have been ascertained at the time of the surgery.

Dr. Bennett states the "procuring team felt that the recipient surgeon should be aware of a sputum growing the hemophilus influenza bacteria and the possibility of r[h]abdomyolysis in the donor." But he does not state the significance of this information to the recipient surgeon, or that having this information could have influenced a reasonable person in deciding whether to give or withhold consent. He also does not make a causal link between that information and Biggs's death. Dr. Bennett also states that the donor's blood, urine, and sputum cultures showed "a rare staphylococcal coagulase positive organism." But, again, he does not state the significance of this information, why it should have been disclosed to Biggs, whether it could have influenced a reasonable person in deciding whether to give or withhold consent, or how it relates to Biggs's death. And Dr. Bennett does not connect any of the donor's symptoms or possible conditions to Biggs's death.

We conclude the family's expert reports do not comply with the statute's requirements concerning causation.

We sustain Drs. Sanchez's and Chinnakotla's second issue. In keeping with our disposition of Baylor's issue, we reverse the order of the trial court denying the doctors' motions to dismiss, and we remand to the trial court for its consideration of the family's request for an extension to cure deficiencies in the expert reports.

## CONCLUSION

Having sustained appellants' issues, we reverse the order of the trial court denying appellants' motions to dismiss, and we remand to that court for further proceedings consistent with this opinion.