Affirmed and Memorandum Opinion filed April 8, 2008








Affirmed and Memorandum Opinion filed April 8, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00784-CV

____________

 

PATRICIA D. SALVATO, M.D. AND
DIVERSIFIED MEDICAL PRACTICES, PA, Appellants

 

V.

 

FAUSTINA ANGELO, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE OF ARTHUR LEON ANGELO, JR., DECEASED, LUCAS
ANGELO, SOFIA ANGELO, ARTHUR ANGELO, SR. AND CONNIE ANGELO, Appellees

 



 

On Appeal from the 281st
District Court

Harris County, Texas

Trial Court Cause No. 2007-02024

 



 

M E M O R A N D U M  O P I N I O N








In this interlocutory appeal, appellants Patricia D.
Salvato, M.D. and Diversified Medical Practices, PA (collectively ADr. Salvato@) appeal the trial
court=s denial of a
motion to dismiss a medical malpractice action.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 74.351 (Vernon 2005).  Dr. Salvato
contends the expert report served by appellees Faustina Angelo, individually
and as representative of the estate of Arthur Leon Angelo, Jr., deceased,
Lucas  Angelo, Sofia Angelo, Arthur Angelo, Sr., and Connie Angelo
(collectively AAngelo@) was insufficient.  Finding no abuse of
discretion, we affirm.

I. Background

On December 14, 2000, Arthur Angelo, a body-builder with a
history of anabolic steroid use, came to Dr. Salvato for treatment of low
testosterone levels and generalized anxiety disorder.  Mr. Angelo was informed
that he could receive prescriptions for anabolic steroids only if he joined a
clinical study being conducted by Dr. Salvato focusing on the efficacy of
anabolic steroids in HIV/AIDS patients suffering from wasting syndrome.  Mr.
Angelo volunteered and was enrolled as a member of the control group in Dr.
Salvato=s clinical study. 
The initial study included the prescription of anabolic steroids and human
growth hormone over a nine-month period, beginning on December 14, 2000. 
Following the initial nine-month study, Dr. Salvato enrolled Mr. Angelo in
extensions over the next several years.  In addition to anabolic steroids and
human growth hormone, Dr. Salvato also prescribed Valium to Mr. Angelo for
pain.     

Mr. Angelo exhibited side effects of steroid use during the
study, including hypertension, testicular atrophy, worsening anxiety, and
insomnia.  Mr. Angelo also complained of chest discomfort and exhibited signs
of left ventricular hypertrophy in ECG readings that showed elevated QRS
voltage attributable to left ventricular hypertrophy.[1] 
Dr. Salvato continued to prescribe anabolic steroids and human growth hormones
to Mr. Angelo.








Mr. Angelo last communicated with Dr. Salvato concerning
his treatment sometime between March 1, 2004 and September 7, 2004.  Mr. Angelo
was found dead in his home on October 31, 2004.  Mr. Angelo=s death was
attributed to hypertensive and atherosclerotic cardiovascular disease.[2] 


Suit was filed on January 11, 2007, contending that Dr.
Salvato was negligent in prescribing medications which were inappropriate,
unlawful, and not in accordance with the standards of medical care in and
around Harris County, Texas at the time.  It was further alleged that these
acts and omissions were the proximate cause of Arthur Angelo=s death.








Pursuant to statute, an expert report from Nancy Campbell,
M.D. was timely served on May 3, 2007.  See Tex. Civ. Prac. & Rem.
Code Ann. '' 74.351, 74.401 (Vernon 2005).  In that report, Dr.
Campbell opined that Dr. Salvato departed from the normal standard of care by
(1) failing to obtain IRB approval[3]
and continuing review of the clinical study; (2) failing to maintain an adverse
event log; (3) failing to maintain records of proper oversight and monitoring
by another party; (4) continuing to prescribe anabolic steroids for more than
three years despite the appearance of known side effects of anabolic steroid
use in Mr. Angelo=s examinations; (5) failing to conduct
necessary lab work related to known side effects of anabolic steroid use; and
(6) failing to conduct further tests when medical examinations indicated and
Mr. Angelo reported signs of heart disease.  Dr. Campbell further opined that
Dr. Salvato=s continued prescription of anabolic steroids led to
cardiomegaly[4]
with left ventricular hypertrophy and stenosis of 70% of the left anterior
descending coronary artery, which in turn led to Mr. Angelo=s death from
hypertensive and atherosclerotic cardiovascular disease.

Dr. Salvato moved to dismiss Angelo=s suit in trial
court under section 74.351(b).[5]  
The trial court denied the motion to dismiss. 

Dr. Salvato contends on appeal that Dr. Campbell=s expert report
does not satisfy sections 74.351 and 74.401.  Dr. Salvato contends that (1) Dr.
Campbell is not qualified to opine on key issues in this case; and (2) Dr.
Campbell=s report is
deficient because it is conclusory with regard to the standard of care and
causation. 

II. Appellate Jurisdiction 

We first consider this court=s appellate jurisdiction. 
This is a question of law reviewed de novo.  State v. Holland,
221 S.W.3d 639, 642 (Tex. 2007).  

When, as here, a trial court has not signed a final and
appealable order, we may not proceed unless an interlocutory appeal is
allowed.  Tex. A&M Univ. Sys. v. Koseoglu, 233 S.W.3d 835,
840 (Tex. 2007).  When reviewing a statutory grant of interlocutory appellate
jurisdiction, we look to the legislature=s intent as
expressed in the statute=s plain words and consider disputed
provisions in context.  See id.; Tex. Dep=t of Transp. v.
Needham, 82 S.W.3d 314, 318 (Tex. 2002).  Civil Practice and Remedies Code
section 51.014 governs appeals from interlocutory orders; it should be strictly
construed as Aa narrow exception to the general rule that only final
judgments and orders are appealable.@  Bally Total
Fitness Corp. v. Jackson, 53 S.W.3d 352, 355 (Tex. 2001). 








Section 51.014(a)(9) allows an immediate appeal from an
interlocutory order that Adenies all or part of the relief sought by
motion under section 74.351(b), except that an appeal may not be taken from an
order granting an extension under Section 74.351.@[6]   Tex. Civ. Prac.
& Rem. Code Ann. ' 51.014(a)(9) (Vernon Supp. 2007).  In turn,
section 74.351(b) states: 

(b) If, as to a defendant physician or health care provider, an expert
report has not been served within the period specified by Subsection (a), the
court, on the motion of the affected physician or health care provider, shall,
subject to Subsection (c), enter an order that: 

(1) awards to the affected physician or health care provider reasonable
attorney=s fees and costs of court incurred
by the physician or health care provider; and 

(2) dismisses the claim with
respect to the physician or health care provider, with prejudice to the
refiling of the claim.

 

Tex. Civ. Prac.
& Rem. Code Ann. ' 74.351(b) (Vernon Supp. 2007).

Angelo argues that
an interlocutory appeal is not available for the denial of Dr. Salvato=s motion to
dismiss.  Angelo seizes on this statement from Dr. Salvato=s brief: AThis interlocutory
appeal seeks relief from the August 6, 2007 denial of Appellants= Motion to Dismiss
filed pursuant to Tex. Civ. Prac. & Rem. Code ' 74.351(c) for
failure to serve a competent expert report as required by ' 74.351(a) in this
healthcare liability claim.@  Based on this statement, Angelo contends
that Dr. Salvato challenged the sufficiency of Dr. Campbell=s report only
under section 74.351(c). Angelo seeks dismissal of this appeal, arguing that
the interlocutory appeal statute authorizes immediate appellate review of an
order denying dismissal under section 74.351(b) based on the failure to file a
report B but not an order
denying dismissal under  section 74.351(c) based on the filing of a deficient
report. 








Angelo=s argument fails
for two reasons.  First, Dr. Salvato specifically invoked section 74.351(b) in
the motion to dismiss filed in the trial court.  Second, this court already has
held that the denial of a motion to dismiss based upon an assertedly deficient
report under section 74.351(c) is appealable under section 51.014(a)(9),
reasoning that A[a]n expert report >has not been
served, for purposes of section 74.351(b), if elements of the report are found
to be deficient.=@ Group v.
Vicento, 164 S.W.3d 724, 726 n.2 (Tex. App.CHouston [14th
Dist.] 2005, pet. filed).  Therefore, this court has jurisdiction to review the
denial of Dr. Salvato=s motion to dismiss a timely served but
allegedly deficient expert report.[7]

III. Sufficiency
of the Expert Report

A.  Standard of Review

Dr. Salvato
contends the trial court erred in failing to dismiss the case with prejudice
because Angelo=s expert report from Dr. Campbell is deficient.  Dr.
Salvato contends the report is deficient because Dr. Campbell is not qualified
to opine in this case, and because portions of her expert report are
conclusory. 








We review a trial
court=s determination
under section 74.351 for abuse of discretion.  Larson v. Dowing, 197
S.W.3d 303, 304-305 (Tex. 2006); Mem=l Herman
Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  Similarly, we review a trial court=s ruling regarding
the adequacy of an expert report for abuse of discretion.  Am. Transitional
Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877 (Tex. 2001);
Group, 164 S.W.3d at 727.  A trial court commits an abuse of discretion
when it acts in an arbitrary or unreasonable manner without reference to
guiding rules or principles.  See Dowing, 197 S.W.3d at 304-305; Jernigan
v. Langley, 195 S.W.3d 91, 94 (Tex. 2006).  Under this standard, an
appellate court may not substitute its judgment for that of the trial court.  Gray
v. CHCA Bayshore L.P., 189 S.W.3d 855, 858 (Tex. App.CHouston [1st
Dist.] 2006, no pet.).

Analysis of expert
qualifications under section 74.351 is limited to the four corners of the
expert=s report and the
expert=s curriculum
vitae.  See Palacios, 46 S.W.3d at 878; Mem=l Herman
Healthcare Sys., 230 S.W.3d at 758; Gray, 189 S.W.3d at
859.  Qualifications cannot be inferred, but must be present in the expert
report.  See Olveda v. Supulveda, 141 S.W.3d 679, 683 (Tex. App.CSan Antonio 2004,
pet. denied); Hansen v. Starr, 123 S.W.3d 13, 19 (Tex. App.CDallas 2003, pet.
denied).  To be qualified to provide opinion testimony regarding whether a
physician departed from the accepted standard of health care, an expert must
satisfy section 74.401.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(5)(A)
(Vernon 2005).  Section 74.401 provides:

(a) In a suit involving a health
care liability claim against a physician for injury to or death of a patient, a
person may qualify as an expert witness on the issue of whether the physician
departed from accepted standards of medical care only if the person is a
physician who:

(1) is practicing medicine at the
time such testimony is given or was practicing medicine at the time the claim
arose;

(2) has knowledge of accepted
standards of medical care for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim; and

(3) is qualified on the basis of
training or experience to offer an expert opinion regarding those accepted
standards of medical care.

 

Tex. Civ. Prac.
& Rem. Code Ann. ' 74.401(a) (Vernon 2005). 

Under section
74.351, health care liability claimants must provide an expert report to the
defendant no later than 120 days after filing the original petition.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 74.351(a) (Vernon
Supp. 2007).  A defendant may file a motion challenging the adequacy of the
report; the trial court  should grant the motion only when it appears that the
report does not represent a good faith effort to comply with the statutory
definition of an expert report.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(l) (Vernon
Supp. 2007).








When determining
if a good faith effort has been made, the trial court is limited to the four
corners of the report and cannot consider extrinsic evidence.  See Palacios,
46 S.W.3d at 878; Mem=l Herman
Healthcare Sys., 230 S.W.3d at 758; Gray, 189 S.W.3d at 859
(Ain assessing the
report=s sufficiency, the
trial court may not draw any inferences, and must instead rely exclusively on
the information contained within the report=s four corners@).  An expert
report must provide a fair summary of the expert=s opinion
regarding (1) the applicable standard of care; (2) the manner in which the care
provided failed to meet that standard; and  (3) the causal relationship between
the failure and the injury, harm or damages claimed.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 74.351(r)(6) (Vernon Supp. 2007); Patel,
237 S.W.3d at 904.  

To satisfy these
standards, the expert report must include enough information to satisfy two
requirements.  The report must (1) inform the defendant of the specific conduct
the plaintiff has called into question; and (2) provide a basis for the trial
court to conclude the claims are meritorious.  Palacios, 46 S.W.3d at
879; Patel, 237 S.W.3d at 904.  AA report merely
expressing the expert=s conclusions concerning the standard of
care, breach, and causation fails to fulfill these purposes.@ Patel, 237
S.W.3d at 904 (citing Palacios, 46 S.W.3d at 879).  The expert=s report need not
identify all evidence necessary to litigate the merits of the plaintiff=s case, but it
must link the expert=s opinions on these elements to the facts
in the case.  Wright, 79 S.W.3d at 52; Palacios, 46 S.W.3d at
879.  

B.  Dr. Campbell=s Qualifications

Angelo contends
that Dr. Salvato was negligent in prescribing anabolic steroids to Mr. Angelo
as part of her clinical study of the effects of anabolic steroids on HIV/AIDS
patients suffering from wasting syndrome.  Angelo further contends that these
acts and omissions were the proximate cause of Mr. Angelo=s death. Angelo
relies on Dr. Campbell to support these contentions.   








Angelo retained
Dr. Campbell to review the medial records from Dr. Salvato=s office, the
autopsy report from the medical examiner, and the death certificate.  Based
upon these records, and her experience, training, knowledge, and qualifications
as a physician, Dr. Campbell opined that Dr. Salvato departed from the normal
standard of care by (1) failing to obtain IRB approval and continuing review of
the clinical study; (2) failing to maintain an adverse event log; (3) failing
to maintain records of proper oversight and monitoring by another party; (4)
continuing to prescribe anabolic steroids to Mr. Angelo for more than 40 months
despite the appearance of known side effects of anabolic steroid use; (5)
failing to conduct necessary lab work related to known side-effects of anabolic
steroid use; and (6) failing to conduct further tests when medical examinations
indicated and Mr. Angelo reported signs of heart disease.  Dr. Campbell further
opined that Dr. Salvato=s continued prescription of anabolic
steroids led to cardiomegaly with left ventricular hypertrophy and stenosis of
70% of the left anterior descending coronary artery; this in turn caused Mr.
Angelo=s death from
hypertensive and atherosclerotic cardiovascular disease.

Under section
74.401(a), only a physician can opine as an expert against another physician. 
It does not follow, however, that every physician is a qualified expert. See
Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996).  While Aexpert
qualifications should not be too narrowly drawn . . . given the increasing
specialization and technical nature of medicine, there is no validity, if there
ever was, to the notion that every licensed medical doctor should be automatically
qualified to testify as an expert on every medical question.@  Larson,
197 S.W.3d at 305 (citing Broders, 924 S.W.2d at 152).  However, when a
subject matter is common to and equally recognized in all fields of practice,
any physician familiar with the subject may testify as to the standard of
care.  See Keo v. Vu, 76 S.W.3d 725, 732 (Tex. App.CHouston [1st
Dist.] 2002, pet. denied).  Likewise, where two fields of medicine overlap, and
a procedure is common to more than one field, a physician in one of these
fields may opine as to the standard of care for that procedure in the other
field.  Id.  








Dr. Campbell=s curriculum vitae
recites that she spent three years in residency at Memorial Hospital Southwest,
and that she has been board certified in family practice for more than 13
years.  She states that her opinions in the report are based upon her
experience, training, knowledge, and qualifications as a physician.  As a board
certified family practitioner who has been an active staff member of Memorial
Hospital Southwest for more than a decade,  has been Medical Director of Brenco
Research, and has conducted more than 100 clinical studies, Dr. Campbell  has
experience in treating patients with a wide range of maladies.  Dr. Campbell
described her knowledge regarding the standard of care governing clinical
studies like the one conducted by Dr. Salvato, and regarding the monitoring of
cardiovascular health for each participant as part of the overseeing physician=s responsibility.
We cannot say that the trial court abused its discretion in concluding that Dr.
Campbell demonstrated sufficient qualifications to opine about standards of
care in connection with monitoring the health, including cardiovascular health,
of patients participating in clinical studies.

Dr. Salvato
concedes that Dr. Campbell may be qualified to opine about the standard of care
governing Dr. Salvato=s research methodology and findings.  Dr.
Salvato nonetheless maintains that Dr. Campbell is not qualified to opine about
standards of care governing the prescribing of anabolic steroids or about
cardiovascular disease.  Dr. Salvato contends that Dr. Campbell is not a
cardiologist and lacks other experience that would qualify her to give expert
testimony on the treatment of cardiovascular disease; Dr. Salvato also
emphasizes that Dr. Campbell is not an endocrinologist, and asserts that she is
not otherwise qualified to testify about the side effects of anabolic
steroids.  While Dr. Salvato concedes that some family practitioners might be
qualified to opine about steroid use or cardiovascular disease, Dr. Salvato
contends that Dr. Campbell=s curriculum vita and report fail to
establish her particular experience or qualifications to opine on these areas
of medical expertise.      Dr. Salvato=s contentions fall
short of establishing an abuse of discretion.  ADespite the fact
that we live in a world of niche medical practices and multilayer
specializations, there are certain standards of medical care that apply to
multiple schools of practice and any medical doctor.@  Blan v. Ali, 7
S.W.3d 741, 746 (Tex. App.CHouston [14th Dist.] 1999, no pet.).








The facts in Blan
are instructive.  The physician at issue properly was able to opine about
the standard of care for a stroke patient, and was not purporting to offer
expert medical opinions peculiar to the field of cardiology.  For that reason,
the trial court in Blan abused its discretion by excluding the expert=s testimony about
the standard of care when his testimony concerned a matter common to all
physicians.  Id.; see also McKowen v. Ragston, __ S.W.3d __, 2007
WL79330, at *5 (Tex. App.CHouston [1st Dist.] Jan. 11, 2007, no
pet.) (when Athe subject of inquiry is common to and equally
recognized and developed in all fields of practice, then any physician familiar
with the subject may testify as to standard of care@) (citing Sears
v. Cooper, 574 S.W.2d 612, 614 (Tex. App.CHouston [14th
Dist.] 1978, writ ref=d  n.r.e.)).  

Here, the trial
court acted within its discretion by applying this teaching and concluding that
Dr. Campbell is qualified to opine about specific areas B such as the
conduct of a clinical study and cardiac health B that are common
to multiple fields of practice.

Dr. Campbell=s curriculum vitae
and report also provide a reasonable basis for the trial court to have
concluded that Dr. Campbell is qualified to opine about the effects of
hormones.  Dr. Salvato acknowledged at oral argument that one need not
necessarily be an endocrinologist to address issues regarding the effects of
hormones.  Dr. Campbell=s  curriculum vitae demonstrates
experience with clinical studies involving hormone-related research.  These
studies include research regarding the prescription of Eclomiphene to treat low
testosterone in men and parathyroid hormone studies in women.  Thus, while Dr.
Campbell is not an endocrinologist, she provides sufficient evidence of her
knowledge in connection with studies prescribing and monitoring hormones in
patients.  See McKowen , __ S.W.3d __, 2007 WL79330, at *5 (AA medical witness
from one practice area may be qualified to testify if he has practical
knowledge of what is customarily done by other practitioners under
circumstances similar to those at issue in the case@); Blan, 7
S.W.3d at 745 (the emphasis is on the plaintiff=s condition, not
the defendant=s expertise, and physician expert need not be a
specialist to opine). 








The trial court
found that Dr. Campbell is qualified to opine as an expert on medical treatment
of Mr. Angelo.  The trial court=s decision comported with guiding
principles and rules governing sufficiency of expert reports.  The trial court
acted within its discretion.  See Larson, 197 S.W.3d at 304-05 (Aexpert
qualifications should not be too narrowly drawn;@ in a close call,
the decision as to whether expert testimony qualifies must go to the trial
court).

We overrule Dr.
Salvato=s first issue.

C.  Standard of
Care and Causation

Dr. Salvato argues
next that the expert report is deficient.  Dr. Salvato argues that Dr. Campbell=s report does not
set forth the standard of care for conducting a clinical study or for
prescribing anabolic steroids.  Dr. Salvato claims that Dr. Campbell=s report does not Aconvincingly tie
the alleged departure from the standard of care to specific facts of the case.@  Dr. Salvato
argues that because Dr. Campbell=s report does not
set forth a standard of review, it does not inform Dr. Salvato as to how he
breached that standard of care.  Dr. Salvato also contends that Dr. Campbell=s report does not
link the allegations of negligence to the damages Angelo claims.  Dr. Salvato
therefore concludes that Dr. Campbell=s opinions
concerning causation are impermissibly conclusory.








An expert report
need not marshal all of the plaintiff=s proof, but it
must include the expert=s opinions on the three statutory elements
B standard of care,
breach, and causation. Gray, 189 S.W.3d at 859.  Likewise, a
trial court shall grant a motion challenging the adequacy of a report only if
it appears to the court that the report does not represent a good faith effort
to comply with the definition of an expert report in section 74.351(r)(6).  See
Tex. Civ. Prac. & Rem. Code ' 74.351(l) (Vernon
Supp. 2007); Palacios, 46 S.W.3d at 879 (if any of the three statutory
elements are missing, the report is not a good faith effort).  An expert report
must provide enough information to fulfill two purposes to constitute an
objective good faith effort.  The report must inform the defendant of the
specific conduct the plaintiff has called into question, and it must provide a
basis for the trial judge to conclude the claims have merit.  See Palacios,
46 S.W.3d at 878-79; Baylor Univ. Med. Ctr. v. Biggs, 237 S.W.3d 909,
916-17 (Tex. App.CDallas 2007, pet. filed); Gray, 189
S.W.3d at 859.  

Applying these
precepts in light of the standard of review, we conclude that the trial court
acted within its discretion in concluding that Dr. Campbell=s report provided
sufficient specificity regarding the standard of care and causation.   

Dr. Campbell=s report addresses
the standard of care required for a clinical study in which the physician is
prescribing a medication with known side effects.  Dr. Campbell describes the
proper conduct of a clinical study, noting the FDA=s requirement of
IRB approval of any clinical study; the need for oversight; the need to monitor
the patient=s health; the need to record potential adverse
effects; the preeminence of patient health throughout; the need to determine
the cause of apparent adverse health indicators; and the need to withdraw a
patient from a study when that patient demonstrates indicators of adverse
health.  Dr. Campbell opines as to the standard of care required for any doctor
prescribing medicine to a patient, especially with heart disease symptoms like
those exhibited by Mr. Angelo, including the need for further tests, proper
diagnosis, and cessation of the test medication.

Dr. Campbell
opined that Dr. Salvato=s continued prescription of anabolic
steroids when Mr. Angelo was experiencing Aknown toxic
side-effects of those steroids@ was a breach of the standard of care for
a doctor conducting a clinical study and having the obligation to put the health
of the participant first.  Dr. Campbell=s report gives Dr.
Salvato adequate notice of the alleged breaches of the standard of care in her
treatment of Mr. Angelo during his participation in Dr. Salvato=s clinical study. 
See Palacios, 46 S.W.3d at 878-79; Biggs, 237 S.W.3d at 916-17; Gray,
189 S.W.3d at 859.








Dr. Campbell=s report does not
state conclusions without reference to the underlying facts upon which she has
premised her opinion.  Patel, 237 S.W.3d at 904 (citing Palacios,
46 S.W.3d at 879).  She links each element of the standard of care in the
treatment of a participant in a clinical study to the facts of the case, noting
where and how Dr. Salvato departed from that standard of care. Dr. Campbell
opined that Dr. Salvato failed to correctly monitor Mr. Angelo.  As an example,
she focused on Dr. Salvato=s failure to monitor Mr. Angelo=s lipid levels in
light of the known increase in lipid levels associated with anabolic steroid
use that were noted in Dr. Salvato=s notes.  Dr.
Campbell opined that Dr. Salvato assessed Mr. Angelo=s lipid levels in
2001, but then failed to do so for the following three years.  Dr. Campbell
noted that Dr. Salvato failed to monitor lipid levels even while aware that it
was important for cardiac health to watch them.  Dr. Campbell=s report noted
that Mr. Angelo suffered chest pains, elevated blood pressure, and increased
QRS voltage, all symptoms of heart disease.  Dr. Salvato=s notes also
revealed that Mr. Angelo complained of worsening anxiety, insomnia, and
testicular atrophy, all known side effects of anabolic steroid abuse.  Dr.
Campbell noted that no adverse event log was maintained; that symptoms of cardiac
disease were overlooked or mis-diagnosed; and that Mr. Angelo was prescribed
additional steroids.  Even when Mr. Angelo was diagnosed with hypertension, Dr.
Salvato continued to prescribe anabolic steroids to Mr. Angelo in violation of
the standard of care associated with a clinical study and the prescription of a
drug. The trial court acted within its discretion in concluding that these
opinions suffice to identify specific conduct and to provide a basis for
concluding the claims have merit.

As to causation,
Dr. Campbell opines that the warning signs of cardiac disease should have led
Dr. Salvato to (1) exclude Mr. Angelo from the study; (2) cease prescribing
anabolic steroids to Mr. Angelo once adverse health indicators were noted; and
(3) conduct further cardiovascular evaluation to properly diagnose left
ventricular hypertrophy, an abnormality  related to the abuse of anabolic
steroids. Dr. Campbell opines that these failures, and the continued
prescription of anabolic steroids, caused the left ventricular hypertrophy and
related chronic hypertension that proximately caused Mr. Angelo=s death B which the autopsy
attributed to cardiac disease. According to Dr. Campbell=s report, Dr.
Salvato failed to accurately monitor Mr. Angelo=s health and
withdraw him from the study given the harm that the anabolic steroids were
causing. 








The trial court
found that Dr. Campbell=s report was sufficient to apprise Dr.
Salvato of the specific conduct Angelo alleges was a departure from the
standard of care, and the basis for establishing a causal link between the departures
and Mr. Angelo=s death. Gray, 189 S.W.3d at 859.  The
trial court=s decision was within the scope of its discretion. Larson,
197 S.W.3d at 304-05; see also Mem=l Herman
Healthcare Sys., 230 S.W.3d at 757.

We overrule Dr.
Salvato=s second issue.

IV. Conclusion 

The trial court
found that Dr. Campbell=s report, coupled with her curriculum
vitae, provided a sufficient basis to conclude she is qualified to offer expert
testimony in this case. The trial court concluded that the requisite
specificity regarding standard of care and causation are present in Dr.
Campbell=s report.  The
trial court acted within its discretion in so doing.

The trial court=s order is
affirmed.

 

 

/s/        William J. Boyce

Justice

 

Judgment rendered and Memorandum
Opinion filed April 8, 2008.

Panel consists of Chief Justice
Hedges, and Justices Anderson and Boyce.









[1]  The QRS complex is a structure on the
electrocardiogram (ECG) that corresponds to the Q, R, and S waves representing
the depolarization of the ventricles. A proper ECG reading can measure the rate
and regularity of heartbeats, as well as determine the size and position of the
chambers.  This enables a practitioner to assess the presence of any damage to
the heart and the effects of drugs or devices to regulate the heart.  Elevated
QRS readings have been linked to left ventricular hypertrophy B a condition that may occur naturally but also has
been linked to certain conditions.  Left ventricular hypertrophy is a
thickening of the muscle on the left ventricle of the heart, and has been
linked to aortic stenosis (a malfunction of the valve between the left
ventricle and the aorta which impedes blood flow); aortic insufficiency (a 
malfunction of the valve between the left ventricle and the aorta which allows
blood to flow in the wrong direction); and hypertension (chronic high blood
pressure). 





[2]  Atherosclerotic cardiovascular disease is a disease that affects the arterial blood vessels, often referred to
as Ahardening@ or
Afurring@ of
the arteries.





[3]  All clinical studies are required to have Institutional
Review Board (IRB) approval before commencing.  Universities and medical
establishments that conduct clinical trials appoint knowledgeable individuals
to sit on these boards and to screen all trials to insure that they are
ethical, protective of the health of the individuals, and conducted in
accordance with solid methodological standards.





[4]  Cardiomegaly is a medical condition wherein the
heart is enlarged.





[5]  Defendants=
motion to dismiss, filed June 7, 2007, sought dismissal pursuant to Texas Civil Practice and Remedies
Code section 74.351(b); the motion did not assert that Angelo failed to file a
report, but rather that Angelo failed to file a Acompetent expert report by a qualified expert.@   





[6]  Section 51.014(a)(10) also allows an interlocutory appeal from the
granting of a motion to dismiss under section 74.351(l), which provides that a court Ashall grant a motion challenging the adequacy of an expert report only
if it appears to the court, after hearing, that the report does not represents
an objective good faith effort to comply with the definition of an expert
report in Subsection (r)(6).@ See Tex. Civ. Prac. & Rem. Code ' 74.351(l) (Vernon Supp. 2007).





[7]  The following decisions adopt Group=s reasoning or employ similar reasoning: CHCA
Mainland, L.P. v. Burkhalter, 228 S.W.3d 221, 224B25 (Tex. App.CHouston
[1st Dist.] 2007, no pet.); HealthSouth Corp. v. Searcy, 227 S.W.3d 907,
908 (Tex. App.CDallas 2007, no pet.); Sides v. Guevara, ___
S.W.3d ___, 2007 WL 2456882, at *2 (Tex. App.CEl Paso Aug. 30, 2007, no pet.).  Other decisions conclude there is no
appellate jurisdiction under these circumstances.  See, e.g., Jain v.
Stafford, 214 S.W.3d 94, 97 (Tex. App.CFort
Worth 2006, no pet.); Lewis v. Funderburk, 191 S.W.3d 756, 759 (Tex.
App.CWaco , 2006, pet. granted). The Texas Supreme
Court has not decided this issue, which is pending before the court in Funderburk.