

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-14-00008-CV
_____


W.B.M. MANAGEMENT COMPANY
D/B/A VIVIANS NURSING HOME, APPELLANT

V.

MARY FLORES, APPELLEE


On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 101179-E, Honorable Douglas Woodburn, Presiding


April 25, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


This is an interlocutory appeal in a health care liability suit.[1] Appellant W.B.M. Management Company D/B/A Vivians Nursing Home ("the Home") appeals the trial court's order overruling its objections to an expert's report and denying its motion to dismiss the suit. We will reverse the trial court's order and remand the cause to the trial court for dismissal.

---

[1] See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West 2012).

Background

Appellee Mary Flores filed suit against the Home after the death of her mother Dionisia Dominguez Gomez, alleging the Home was negligent in its care and treatment of her mother. Flores' amended pleadings alleged in particular the Home's employees negligently failed to diagnose timely and treat her mother's urinary tract infection, leading eventually to her mother's death.

In May 2013, Flores served the Home with the report and curriculum vitae of James E. Moulsdale, M.D., F.A.C.S.[2] The Home timely objected to the report. After Flores responded, the trial court heard the Home's objections in September 2013. The trial court found the report deficient, and granted a 30-day extension to address the identified deficiencies.

The amended report was filed in late October 2013. The Home again filed objections and moved to dismiss Flores' claims pursuant to section 74.351(b) of the Civil Practice & Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b) (West 2013). The trial court heard argument at a hearing in December 2013, overruled the objections to the amended report and denied the Home's motion to dismiss. The Home has brought this interlocutory appeal.

---

[2] Dr. Moulsdale is a board-certified urologist who has practiced in the field for over 34 years. He holds accreditation in a number of urological fields, and has published several articles. The Home does not challenge Moulsdale's qualifications on appeal.

Analysis

Through one issue, the Home challenges the sufficiency of Moulsdale's amended expert report, contending the report was "impermissibly speculative and conclusory" in its attempt to describe the "causal relationship between the alleged breach of the standard of care by [the Home] and the death of Dionisia Dominguez Gomez." The Home's issue also contends the amended report inadequately described the applicable standard of care and its alleged breach.

We review a trial court's decision on a motion to dismiss a health care liability claim for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). However, an incorrect construction of the law or a misapplication of the law to undisputed facts is an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts"); *see Perry Homes v. Cull,* 258 S.W.3d 580, 598 n.102 (Tex. 2008) (quoting *Walker*).

3

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Gray,* 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

If a defendant files a motion challenging the adequacy of the claimant's expert report, the trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). Making that inquiry, the court considers only the information contained within the four corners of the report. *Palacios,* 46 S.W.3d at 878. Although the claimant need not marshal all her proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878-79; *Gray,* 189 S.W.3d at 859.

To constitute a good faith effort, in setting out the expert's opinions on the standard of care, the breach of the standard and the causative relationship between the breach and the injury, harm or damages claimed, the report must provide enough information to fulfill two purposes. *Palacios,* 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the claimant has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two

4

purposes. *Id.* "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). But a claimant need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report need not meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Id.*

In Moulsdale's October 2013 report, he stated:

> I have been asked to review the care rendered to the above-captioned individual in January, 2011. She was, at that time, a resident of Vivians Nursing Home. Historically, the patient had had a CVA in the remote past, leaving her extremely debilitated and unable to care for herself, necessitating nursing home placement. I reviewed the records from Vivian's Nursing Home for the period of August, 2010 through January, 2011. On January 10, 2011, the patient was found to have increasing mental confusion and a probable urinary tract infection. She was subsequently taken by ambulance to Baptist St. Anthony Hospital in Amarillo, Texas, where she was found to have a severe urinary tract infection and probable urosepsis. She was treated aggressively and appeared to recover but was later sent to hospice care and expired there.

> The standard of care applicable to this type of patient is careful monitoring, especially since she was unable to communicate any problems she might be experiencing. Careful monitoring would include taking her vital signs (i.e. blood pressure, pulse rate, body temperature, and respiratory rate) at a minimum of once per day in order to detect any changes in her condition. Especially in a debilitated patient, it is essential to monitor vital signs in order to detect changes in the patient's condition, such as urinary tract infection, since the patient is not able to alert the staff on his/her own.

> In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact, only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood

pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.

I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract infection. In my training and experience as a urologist, it is more likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.[3]

The Home's objections asserted that the amended report failed to adequately address the standard of care applicable to the Home and how the standard of care was allegedly breached by the Home or its employees. The Home also asserted the amended report failed to address the causal relationship between the alleged breach and the injury, harm or damages claimed by Flores, and asserted the amended report contained only global and conclusory statements concerning the causal connection.

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Whether a defendant breached a duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880.

---

[3] The date of Ms. Gomez's death is not stated in Moulsdale's report, but Flores' brief states she died on January 24, 2011.

According to Moulsdale's report, the applicable standard of care for treatment of a debilitated patient like Ms. Gomez required that the Home monitor her carefully, taking her vital signs, defined as blood pressure, pulse rate, body temperature and respiratory rate, at least once per day to detect changes in her condition. Addressing the Home's breach of the standard of care, Moulsdale's report states that his review of the nursing home records reveals notes that Ms. Gomez's vital signs were to be taken only once per week and records further indicating that her vital signs were indeed taken once per week.

Moulsdale further explains that because the vital signs were not taken daily, Ms. Gomez's urinary tract infection went undetected long enough to develop into sepsis, a life-threatening condition requiring hospitalization. He states "[m]ore likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation."

Our discussion will focus on causation because we readily conclude that in its discussion of that element, Moulsdale's amended report does not constitute a good faith effort toward compliance with the statutory requirements.

Reiterated, an expert report that merely states the expert's conclusions does not provide enough information to fulfill the purposes of the report. *Bowie,* 79 S.W.3d at 52 (*citing Palacios*, 46 S.W.3d at 879). The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. Otherwise, the

report neither informs the defendant of the specific conduct the claimant calls into question nor provides a basis for the trial court to conclude the claim has merit. *Id.*

A case Flores cites is helpful to demonstrate the inadequacies of Moulsdale's report. *Mosely v. Mundine,* 249 S.W.3d 775 (Tex. App.—Dallas 2008, no pet.), dealt with a claim a physician failed to detect an early stage of cancer. The physician moved to dismiss the claim, asserting the expert report expressed only conclusory statements as to the causative relationship between the failure to detect and the harm to the patient. *Id.* at 780-81. The expert report there, as relevant to causation, stated:

> In the case of Mrs. Mundine, Dr. Mosley [sic] failed to identify a 1cm nodule on the chest x-ray during the ER visit in 5/2004. Approximately 21 months later this nodule had developed into a 6cm mass extending into the lung tissue with undetermined metastasis. Mrs. Mundine has a poor prognosis given the extent of the tumor growth and required lung resection, chemotherapy[,] and radiation. Had this cancer been detected in 2004[,] the likelihood of survival for Mrs. Mundine would have been significantly greater with a much less invasive treatment protocol. Dr. Mosley [sic] breached the standard of care by failing to detect the early stage of the cancer in May 2004.
>
> * * *
>
> . . . . Dr. Mosely failed to identify the early cancer nodule in Mrs. Mundine in 2004. This failure resulted in delayed diagnosis of lung cancer, required invasive and aggressive treatment and in all medically probability significant reduction in the life expectancy of Mrs. Mundine.
>
> 249 S.W.3d at 780.

The appeals court affirmed the trial court's denial of the physician's motion. It held the trial court could have concluded the report "established a causal relationship" between the physician's departure from the standard of care and the patient's injury. In so concluding, the court found the expert's report linked the physician's failure to identify

8

the one-centimeter nodule in 2004 to the patient's injury from the developed six-centimeter mass some 21 months later.  *Id.* at 781.

The report in *Mosely* gave the trial court a factual basis to understand the change in the patient's condition between the breach of the standard, occurring on a known occasion on which the patient had a one-centimeter nodule, and the later condition when the nodule had become a six-centimeter mass.  249 S.W.3d at 780.  By contrast with that report found adequate as to causation, Moulsdale's report contains the facts that on January 10, 2011, Ms. Gomez, a debilitated patient, "was found to have increasing mental confusion and a probable urinary tract infection," and was subsequently taken by ambulance to the hospital, where she was diagnosed with a severe urinary tract infection and probable urosepsis.  The report speaks in conclusory fashion of a "delay in diagnosis," but contains no facts on which one may base a conclusion that there occurred a delay in diagnosing her infection or that any such delay was attributable to a failure of the Home to check her vital signs daily.  The report's statement that "more likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation"[4] is not factual, but merely a more detailed statement of Moulsdale's opinion.  The report contains no factual statement describing when, relative to January 10, the Home's employees last checked Ms. Gomez's vital signs.  Nor does it contain statements of what any of Ms. Gomez's vital

---

[4] The statement is one of those added by the amended report.

9

signs were at any point in time, before, during or after her diagnosis, or how any of her vital signs had changed from any point in time to another.

With regard to her hospital care, Moulsdale's report adds only the facts that Ms. Gomez was treated aggressively and appeared to recover but later died under hospice care. The report concludes with the statement that, according to her death certificate, the cause of Ms. Gomez's death was "sepsis secondary to urinary tract infection." But the report contains nothing to link that fact with his conclusion the Home's failure to check her vital signs daily in the days before her hospitalization led to her septic condition or her death some two weeks later. And we cannot engage in inferences to supply information not present within the four corners of the report. *See Bowie*, 79 S.W.3d at 53.

Moulsdale's report may also be compared with the expert report considered in *Craig v. Dearbonne*, 259 S.W.3d 308 (Tex. App.—Beaumont 2008, no pet.). Mrs. Dearbonne was admitted to a hospital on January 25 with admitting diagnoses that included "respiratory distress/shortness of breath" and pneumonia. Over the next four days, her condition deteriorated and she was transferred to another facility where she died a few days later. The expert report addressed what it described as breaches of the standard of care by a physician during her four-day hospital stay. Reversing the trial court's denial of challenges to the expert report, the appellate court held the report was conclusory as to causation. The court summarized the expert report's discussion of causation as follows:

> [Expert's] report explains that the standard of care required [the physician] to examine and assess [the patient] on a daily basis, and that daily chest

10

x-rays should have been performed. In addition, the report states that if [the physician] had examined [the patient's] lungs, then "more likely than not" she would have found that [the patient's] pneumonia and congestive heart failure had worsened, and those conditions "could have been effectively treated more likely than not." The report also concludes that if [the physician] had performed "proper assessment and treatment" on January 26, 27, or 28, "then more likely than not, [the patient] could have been successfully treated and would not have died when she did." [Expert] further concludes in the report that [physician's] negligence proximately caused [patient's] death, and if [physician] had not been negligent, [patient] "would not have died when she did."

259 S.W.3d at 312. The court found the expert's statements conclusory because they were not linked to the facts and did not explain how the physician's alleged negligence caused the patient's death. *Id*. at 313 (citing, *inter alia*, *Gonzales v. Graves,* No. 07-03-00268-CV, 2004 Tex. App. LEXIS 2403 (Tex. App.—Amarillo Mar. 16, 2004, no pet.) (mem. op.)).

Moulsdale's report contains even fewer facts than the report in *Craig*. 259 S.W.3d at 312. That report at least described Mrs. Dearbonne's condition on her admission to the hospital, giving the trial court some means to understand the factual consequences of a failure to order daily x-rays. *See Craig*, 259 S.W.3d at 313-14 (Gaultney, J., dissenting). As noted, Moulsdale's report gives no facts regarding Ms. Gomez's vital signs on any day, providing no basis for evaluation of the effects of a failure to check her vital signs daily. *See also Foster v. Richardson*, 303 S.W.3d 833, 842 (Tex. App.—Fort Worth 2009, no pet.) (holding expert report "does not explain beyond mere conjecture" how condition of patient's ankle worsened from June to July so that physician's failure to give correct diagnosis in June caused the requirement of further treatment in July).

11

Moulsdale's report expresses his opinion that the Home's failure to take Ms. Gomez's vital signs at least daily caused a failure to find and timely treat her urinary tract infection. It further expresses his opinion that because the infection was left untreated, it developed into sepsis, a life-threatening condition, ultimately leading to her death. But the report does not explain the basis of Moulsdale's statements to link his conclusions to the facts, *Bowie,* 79 S.W.3d at 52, with the result that it also does not provide a basis for the trial court to conclude the claim has merit. *Id.* Ultimately, it states only Moulsdale's opinions on causation. Accordingly, the report does not set forth a "good faith effort" to provide a fair summary of the causation element as described in the statute. When it overruled the Home's objections to the report's causation element discussion and denied its motion to dismiss, the trial court misapplied the "good faith effort" standard. Our conclusion the report is inadequate in its discussion of causation makes it unnecessary for us to consider the adequacy of its discussion of the standard of care and breach.

Conclusion

We sustain the Home's sole issue. We reverse the trial court's order and remand the cause to the trial court for the limited purposes of determining the Home's reasonably incurred attorney's fees and costs and entry of an order dismissing with prejudice Flores' claims against the Home. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

James T. Campbell
Justice

Pirtle, J., dissenting.